# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-1342
# A14-1343

Michael Harlow,
Respondent,

vs.

State of Minnesota Department of Human Services, et al.,
Appellants.

**Filed April 27, 2015**
**Reversed**
**Kirk, Judge**

Ramsey County District Court
File No. 62-CV-13-1493

Gregg M. Corwin, Gregg M. Corwin & Associate Law Office, P.C., St. Louis Park, Minnesota (for respondent)

Lori Swanson, Attorney General, Althea M. Huyser, Michael Goodwin, Anthony R. Noss, Assistant Attorneys General, St. Paul, Minnesota (for appellants)

Considered and decided by Kirk, Presiding Judge; Ross, Judge; and Reilly, Judge.

## S Y L L A B U S

Data classified as public under one section of the Minnesota Government Data Practices Act (MGDPA) do not lose that classification when separately classified as confidential under another section as part of an ongoing investigation.

## OPINION

**KIRK**, Judge

In this consolidated appeal following the district court's denial of their motion for summary judgment, appellants argue that (1) the district court erred by denying summary judgment on respondent's MGDPA claims because their statements communicated public data; (2) the district court erred by denying summary judgment on respondent's defamation claim because their statements were absolutely privileged; and (3) alternatively, their statements were qualifiedly privileged. We reverse.

## FACTS

Respondent Michael Harlow, M.D., a psychiatrist, was fired from the Minnesota Security Hospital following a patient incident in November 2011. This appeal concerns statements about the incident and Harlow's firing made by appellants David Proffitt, the former administrator of the security hospital, and Anne Barry, Deputy Commissioner of the Minnesota Department of Human Services (DHS), to a reporter for Minnesota Public Radio (MPR) and, in the case of Proffitt, to DHS employees.

On the evening of November 15, 2011, a patient at the Minnesota Security Hospital began yelling, threatening staff, and using a chair to hit doors, walls, and windows. Staff contacted Harlow, the on-call doctor, who authorized the staff to seclude the patient. The patient was put into seclusion in his bedroom, but was later observed to be cutting his arms with a broken marker and covering his window with his mattress. Harlow arrived at the hospital and ordered staff to remove all items from the patient's

2

room, including his MP3 player, personal items, clothing, and mattress. The patient was handcuffed while staff removed the items and cut off his clothing, per Harlow's order, and was left naked in his room for approximately one hour until receiving a tear-proof gown at 11:00 p.m. The patient then requested a blanket and mattress so that he could go to sleep, and staff eventually returned his mattress and blanket at 12:40 a.m. The patient was released from seclusion at 5:15 p.m. on November 16.

DHS immediately opened an investigation (the employment investigation) into the November 15 incident. It interviewed several staff members, including Harlow, about the incident, and issued an investigation report on December 8. This report was later amended to include information from two additional staff members. On December 20, Proffitt fired Harlow.

On February 28, 2012, MPR reporter Madeleine Baran reported about turmoil at the Minnesota Security Hospital. Baran reported that "the current concern among staff was sparked by the firing of psychiatrist Dr. Michael Harlow after an incident in November during which a patient was put in seclusion, placed in handcuffs, and stripped naked." Madeleine Baran, *State facility for the mentally ill risks losing license over turmoil*, MPR News, Feb. 28, 2012, *available at* http://www.mprnews.org/story/2012/02/28/minnesota-security-hospital-turmoil. Baran then described the November 15 incident "according to interviews with security counselors, Harlow, and a newly released 38-page DHS report." *Id.* Baran also

3

interviewed Proffitt and Barry. The following excerpt from Baran's report is at issue in this case:

> Barry, the DHS commissioner assigned to help resolve the facility's licensing issues, said Harlow was fired because he inappropriately used restraints and seclusion. . . .
>
> "We just need to be very clear that we will no longer allow anyone, staff or . . . psychiatrists, to work in such a way that they aren't complying with our policies around restraint and seclusion," Barry said.
>
> Proffitt said the decision to fire Harlow had nothing to do with restraints or seclusion. Staff could have done more to prevent the situation from becoming violent, he said, but once things got out of control, they had no choice but to restrain the patient. . . .
>
> "He was maintained in a dehumanizing condition for hours without clothing, without [a] blanket, without a mattress, without a pillow, even though it was documented he was trying to sleep on the slab and was calm and quiet," Proffitt said. "Those are things that are not common for this facility. They're not acceptable for this facility."

*Id.*

The day after this report, Proffitt sent an e-mail to DHS employees regarding "safety, seclusion, and restraint" at the security hospital. Proffitt referenced a recent report that Harlow felt that he was treated unfairly, and responded: "A violation of an individual's rights[,] i.e., maintaining a vulnerable person in a denuded state for multiple hours without adequate justification[,] required the separation of employment."

DHS's Division of Licensing opened a separate investigation (the licensing investigation) following the November 15 incident, and issued its report on May 24, 2012. This report found that both Harlow and the hospital were responsible for the patient's maltreatment. But the report concluded that "the substantiated maltreatment

4

was not recurring because it was a single event, and was not serious because there were no injuries observed as a result of the maltreatment."

On June 8, 2012, Baran reported on the results of the licensing investigation for MPR. Baran stated that the report found that the patient suffered maltreatment and that "the facility and Dr. Harlow violated licensing standards, but that the violations were not serious or recurring." Madeleine Baran, *Investigation shows complexity of caring for the state's most violent and mentally ill adults*, MPR News, June 8, 2012, *available at* http://www.mprnews.org/story/2012/06/08/investigation-finds-patient-suffered-maltreatment-at-minnesota-security-hospital. After reporting that Harlow intended to appeal the decision, Baran stated: "Department of Human Services Deputy Commissioner Anne Barry, who approved of the decision to fire Harlow, said she was surprised the licensing division did not classify the violation as serious. 'There are human rights violations there,' Barry said." *Id.*

Harlow requested reconsideration from the Division of Licensing. In response to Harlow's additional information, the licensing report was amended in December 2012 to state that the facility was responsible for the patient's maltreatment but that Harlow's responsibility for the incident was "inconclusive."

Harlow then sued DHS, Proffitt, and Barry, alleging defamation and several violations of the MGDPA. Appellants moved for summary judgment on all claims, and the district court denied the motion. The district court found that "there is a genuine issue of material fact as to whether the data disclosed qualifies for" protection under the

5

MGDPA and concluded that multiple factual disputes precluded resolution of appellants' claims of absolute and qualified privilege to Harlow's defamation claim. This appeal follows.[1]

## ISSUES

I.      Did the district court err by denying summary judgment on Harlow's MGDPA claims?

II.     Did the district court err by denying summary judgment on Harlow's defamation claim?

## ANALYSIS

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. When considering a summary-judgment appeal, this court reviews de novo whether there is a genuine issue of material fact and whether the district court erred in applying the law. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002); *see Sletten v. Ramsey Cnty.*, 675 N.W.2d 291, 299 (Minn. 2004) (applying this standard to the district court's denial of summary judgment based on immunity). In doing so, "[w]e view the evidence in the light most favorable to the party against whom summary judgment was granted."

---

[1] Appellants filed an interlocutory appeal of the district court's denial of summary judgment based on absolute and qualified privilege and petitioned for discretionary review of the district court's denial of summary judgment under the MGDPA. This court granted discretionary review and consolidated the appeals.

*STAR Ctrs., Inc.*, 644 N.W.2d at 76-77.  But "the party resisting summary judgment must do more than rest on mere averments."  *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997).

## I.      The district court erred by denying summary judgment on Harlow's MGDPA claims.

The MGDPA

> regulates the collection, creation, storage, maintenance, dissemination, and access to government data in government entities.  It establishes a presumption that government data are public and are accessible by the public for both inspection and copying unless there is federal law, a state statute, or a temporary classification of data that provides that certain data are not public.

Minn. Stat. § 13.01, subd. 3 (2014).  "The purpose of the MGDPA is to reconcile the rights of data subjects to protect personal information from indiscriminate disclosure with the right of the public to know what the government is doing.  The Act also attempts to balance these competing rights within a context of effective government operation." *KSTP-TV v. Ramsey Cnty.*, 806 N.W.2d 785, 788 (Minn. 2011) (quotation omitted).  The district court's interpretation of the MGDPA "is a question of statutory interpretation that we review de novo."  *Helmberger v. Johnson Controls, Inc.*, 839 N.W.2d 527, 531 (Minn. 2013).

In general, personnel data on current and former employees of a government entity are public under the MGDPA.  Minn. Stat. § 13.43, subd. 2(a) (2014). Public personnel data include "the final disposition of any disciplinary action together with the specific reasons for the action and data documenting the basis of the action, excluding data that

7

would identify confidential sources who are employees of the public body." *Id.*, subd. 2(a)(5). Here, the employment investigation documented the basis for Harlow's December 2011 firing, and became public data at the time of the firing, a final disposition regarding Harlow's employment. *See id.*; *id.*, subd. 2(b) (2014) ("[A] final disposition occurs when the government entity makes its final decision about the disciplinary action, regardless of the possibility of any later proceedings or court proceedings."). The employment investigation therefore contained public data at the time of the February 2012 MPR report and e-mail to DHS employees.

Like a final disposition of a disciplinary action, a final licensing decision is public data, along with its findings of fact and conclusions of law. Minn. Stat. § 13.41, subd. 5 (2014). But "active investigative data relating to the investigation of complaints against any licensee" are confidential under the MGDPA. *Id.*, subd. 4 (2014). Because the licensing investigation was active and ongoing until May 2012, its data were confidential at the time the challenged statements were made. *See id.*

Appellants argue that the challenged comments from February 2012 were based solely on public data in the employment investigation. Proffitt and Barry suggested in their depositions that, at the time of their statements, they were aware that the licensing investigation was ongoing but were not aware of its findings. They also stated that their comments were based on the employment investigation alone. Nevertheless, Harlow argues that the comments could have been based on data from the ongoing and confidential licensing investigation. The district court agreed with Harlow's argument,

8

concluding that the challenged statements could have been based on both public data in the employment investigation and confidential data in the licensing investigation. The district court then concluded that there was a genuine issue of material fact regarding whether Proffitt and Barry violated the MGDPA.

The district court's ruling contradicts an advisory opinion of the commissioner of administration.[2] The commissioner of administration has statutory authority to issue advisory opinions regarding the MGDPA. Minn. Stat. § 13.072, subd. 1 (2014); *Navarre v. S. Wash. Cnty. Schs.*, 652 N.W.2d 9, 23 n.5 (Minn. 2002). In a 2008 advisory opinion, the commissioner addressed whether certain data were public as part of a final disposition of disciplinary action under Minn. Stat. § 13.43, subd. 2(a)(5), or private as part of a student maltreatment investigation under Minn. Stat. § 626.556, subd. 11(a). Op. Comm'r Admin. 08-014 (June 26, 2008). The commissioner concluded that the data documenting the basis for the disciplinary action were public under Minn. Stat. § 13.43, subd. 2(a)(5), but that other data that were not the basis for the disciplinary action remained private under Minn. Stat. § 626.556, subd. 11(a). Because a final disposition had occurred in the disciplinary action, that data remained public as classified by the MGDPA, regardless of the separate confidential investigation.

---

[2] The ruling also contradicts an unpublished opinion from this court, which we find persuasive, where we stated: "Although the data gathered by the [government agency] as part of its licensing process may have also become part of a separate criminal investigation file, the classification of the data in the criminal investigation file does not change the classification of the data in the [agency's] license investigation file." *Anjoorian v. Minneapolis Dep't of Pub. Safety*, No. CX-97-242, 1997 WL 527233, at *3 (Minn. App. Aug. 26, 1997), *review denied* (Minn. Oct. 21, 1997).

Harlow is correct that the commissioner's advisory opinion is not binding on this court. *See Navarre*, 652 N.W.2d at 23 n.5. But the opinion can be persuasive authority. *Id.* We find the advisory opinion to be persuasive because it addresses the specific question in this appeal—whether data can lose their public status under the MGDPA due to a separate and ongoing investigation. In addition, the opinion is consistent with the MGDPA's presumption that data can have more than one classification, depending on their use. *See* Minn. Stat. § 13.03, subd. 4(d) (2014) ("If a government entity disseminates data to another government entity, a classification provided for by law at the entity receiving the data does not affect the classification of the data at the entity that disseminates the data."). Data classified as public under one section of the MGDPA do not lose that classification simply because they are simultaneously part of a separate ongoing investigation.

We hold that the data in DHS's employment investigation became public at the time of Harlow's firing, regardless of the ongoing licensing investigation. As a result, any statements about that public data did not violate the MGDPA. *See* Minn. Stat. § 13.43, subd. 2(a)(5); *Johnson v. Dirkswager*, 315 N.W.2d 215, 222 (Minn. 1982) ("[I]t is no violation of the [MGDPA] to tell the reporter about the contents of a public document."). Given our holding, we next address whether the challenged statements were based on the public employment investigation.

### A. Count One

Harlow's first claim under the MGDPA involves statements attributed to Proffitt in the February 2012 MPR report. Baran reported:

> Proffitt said the decision to fire Harlow had nothing to do with restraints or seclusion. Staff could have done more to prevent the situation from becoming violent, he said, but once things got out of control, they had no choice but to restrain the patient. However, he said staff should have returned the patient's clothes more quickly.

The employment investigation detailed the patient's violence and Harlow's decisions regarding seclusion and restraint. Proffitt's statements about Harlow's actions were therefore based on public data in the employment investigation and did not violate the MGDPA.

Neither investigation discussed the reason for Harlow's firing. Proffitt's statement that Harlow's firing "had nothing to do with restraints or seclusion" was a statement of his opinion. The MGDPA applies only to recorded data, not "mental impressions formed by public employees." *Keezer v. Spickard*, 493 N.W.2d 614, 617 (Minn. App. 1992), *review denied* (Minn. Feb. 12, 1993). As this court explained in *Keezer*:

> A plaintiff must point to an actual record whose contents have been disseminated to give rise to a claim for improper release of government data under the Act. A plaintiff cannot establish the Act was violated merely by showing a government employee said something about him and that the statement contained information that arguably might be stored in a government record. If the information in the employee's statement was not actually recorded, then "government data" have not been created or released.

11

*Id.* at 618. Harlow has shown that Proffitt made statements about him, but he has not shown that the statement about the reason for Harlow's firing can be found in a recorded investigation. *See id.* We therefore conclude that Proffitt's statement about Harlow's firing was a mental impression that did not violate the MGDPA.

### B. Count Two

Harlow's second claim under the MGDPA involves a direct quote from Proffitt in the February 2012 MPR report. Baran reported: "'[The patient] was maintained in a dehumanizing condition for hours without clothing, without [a] blanket, without a mattress, without a pillow, even though it was documented he was trying to sleep on the slab and was calm and quiet,' Proffitt said." This information about the patient's condition and behavior appears in the employment investigation. Because this information appears in the employment investigation, which was made public before the February 2012 MPR report, Proffitt's statement did not violate the MGDPA.

### C. Count Three

Harlow's third claim under the MGDPA involves Proffitt's e-mail to DHS employees, specifically Proffitt's statement that "[a] violation of an individual's rights[,] i.e., maintaining a vulnerable person in a denuded state for multiple hours without adequate justification[,] required the separation of employment." The information about the patient's "denuded state" appears in both the employment investigation and licensing investigation. But only the licensing investigation determined that this condition was not

justified. The employment investigation did not reach conclusions regarding whether the patient's treatment was justified.

Like Proffitt's statement about the reason for Harlow's firing, we conclude that this statement about violating the patient's rights was Proffitt's opinion and did not violate the MGDPA. *See id.* at 617. There is no evidence in the record that Proffitt had access to the licensing investigation before its release in May 2012. Proffitt only knew that there was a separate ongoing licensing investigation, not that it would conclude that Harlow's actions were not justified. Given the record, we conclude that Proffitt's statement was based on his opinion, rather than a release of confidential data from the licensing investigation.

### D. Count Four

Harlow's fourth claim under the MGDPA involves statements attributed to Barry in the February 2012 MPR report. Baran reported: "Barry, the DHS commissioner assigned to help resolve the facility's licensing issues, said Harlow was fired because he inappropriately used restraints and seclusion." Again, Harlow's use of restraints and seclusion was detailed in the employment investigation and was public under the MGDPA. And, like Proffitt's statement about the reason for Harlow's firing, Barry's statement was a mental impression that did not violate the MGDPA. *See id.*

### E. Count Five

Harlow's final claim under the MGDPA involves a direct quote from Barry in the February 2012 MPR report. Baran reported: "'We just need to be very clear that we will

no longer allow anyone, staff or . . . psychiatrists, to work in such a way that they aren't complying with our policies around restraint and seclusion,' Barry said." The employment investigation referenced a restraint-and-seclusion policy, but did not describe it. In contrast, the licensing investigation described the policy, and determined that it was not followed.

There is no evidence in the record that Barry had access to the licensing investigation before its May 2012 release or knew that it would conclude that Harlow violated DHS policy.[3] As with the other statements, Barry gave her mental impression based on public data, and did not violate the MGDPA. *See id.*

In sum, the district court erred by denying summary judgment on Harlow's MGDPA claims because the challenged statements were either based on public data in the employment investigation or based on Proffitt's and Barry's opinions.

## II. The district court erred by denying summary judgment on Harlow's defamation claim.

In his defamation claim, Harlow challenged all five statements discussed above, as well as Barry's statement in the June 2012 MPR report regarding human rights violations. Appellants argue that the statements were absolutely privileged, and that the district court therefore erred by denying summary judgment. Whether absolute privilege applies to

---

[3] At oral argument, Harlow suggested that Barry had access to the licensing investigation because its results were eventually changed. We disagree. Barry made her challenged statements in February 2012, and the licensing investigation was completed in May and amended in December. Even if Barry directed the investigation to be changed between May and December, and there is no evidence in the record to that effect, there is no evidence that she had *advance* knowledge of the investigation's conclusions at the time of her statements.

allegedly defamatory statements is a question of law that we review de novo. *Minke v. City of Minneapolis*, 845 N.W.2d 179, 182 (Minn. 2014). "Absolute privilege bars liability for even intentionally false statements, coupled with malice." *Id.* (quotation omitted). As a result, absolute privilege "is not lightly granted and applies only in limited circumstances." *Zutz v. Nelson*, 788 N.W.2d 58, 62 (Minn. 2010).

Absolute privilege for an executive-branch official "depends on a number of factors, including the official's assigned functions, whether the statements made were integral to performing those functions, and the public interest furthered by allowing the official to speak freely about the statement's subject matter." *Bd. of Regents of Univ. of Minn. v. Reid*, 522 N.W.2d 344, 347 (Minn. App. 1994), *review denied* (Minn. Oct. 27, 1994). The district court cited this language in *Reid*, before concluding:

> [T]he availability of an absolute privilege defense to Mr. Proffitt and Ms. Barry will depend upon an analysis of their statements in the context of their respective jobs (and appropriate characterizations of their rank) and whether the statements relate to a topic of public concern or were simply self-serving, contradictory, inaccurate and unnecessarily inflammatory disclosures of non-public information.

But "[t]he availability of absolute immunity to an executive official in defamation suits does not depend on the truth or falsity of the statement or the nature or intent of the speaker." *Id.* By referencing the accuracy of and motivations behind the statements, the district court misstated the standard for absolute privilege.

No caselaw has specifically determined whether a DHS deputy commissioner and the administrator of the security hospital are entitled to absolute privilege. In general,

only high-level executive-branch officials enjoy absolute privilege and "we have been reluctant to extend absolute privilege to lower-level officers." *Minke*, 845 N.W.2d at 182. But absolute privilege does not depend on an official's rank or title. *Reid*, 522 N.W.2d at 347. We have granted absolute privilege to executive-branch officials who hold positions other than commissioner. *See, e.g.*, *Buchanan v. Minn. State Dep't of Health*, 573 N.W.2d 733, 737 (Minn. App. 1998) (extending absolute privilege to the Program Manager for the Minnesota Department of Health's Licensing and Certification Section), *review denied* (Minn. Apr. 30, 1998); *Reid*, 522 N.W.2d at 346-47 (extending absolute privilege to high-level University of Minnesota officials).

Contrary to Harlow's assertion, we conclude that Proffitt and Barry held sufficiently high-ranking positions to qualify for absolute privilege. As the hospital administrator and the deputy commissioner assigned to supervise state treatment programs, Proffitt and Barry were responsible for overseeing the management and operation of the security hospital. Both were higher ranking than the health department program manager in *Buchanan*, whom we found entitled to absolute privilege. *See* 573 N.W.2d at 737 (stating that the program manager supervised "the licensure and inspection of home health care providers"). And Barry even had statutory authority to speak on behalf of the commissioner. *See* Minn. Stat. § 15.06, subd. 7 (2014) ("The deputy commissioner shall have all the powers and authority of the commissioner unless the commissioner directs otherwise, and shall speak for the commissioner within and without the department or agency."). Because Proffitt and Barry were sufficiently high

ranking, we will analyze other factors to determine whether they qualify for absolute privilege. *See Reid*, 522 N.W.2d at 347.

Appellants suggest that this case is similar to *Reid*, in which three University of Minnesota administrators made statements at a press conference suggesting that two university professors had committed civil and criminal fraud. *See id.* at 346. This court concluded that the administrators had absolute immunity because (1) they were designated as spokespersons by the University or their job responsibilities included communicating to the public regarding the subject of the dispute, (2) the statements were integral to the performance of the administrators' assigned functions, and (3) the remarks concerned an issue of critical public concern. *Id.* at 347.

Appellants argue that, as in *Reid*, Proffitt and Barry were designated as spokespersons and made statements integral to the performance of their assigned functions. Barry stated in her deposition that Baran contacted DHS's communications office before her February 2012 report for MPR and that Barry was "assigned the interview" by the DHS communications director because "[it] would have been either [her] or the commissioner who did the interview, and [she] was in a better position to do the interview." *See* Minn. Stat. § 15.06, subd. 7. Proffitt similarly stated that he was told to participate in the MPR interview because it was part of his job. And Proffitt's former supervisor stated in an affidavit that "[c]orresponding with staff in response to press coverage of the facility was one of Proffitt's job-related functions" as hospital administrator.

We conclude that there are no genuine issues of material fact regarding whether Proffitt and Barry were designated as spokespersons and gave statements according to their assigned functions. Harlow cites no fact in the record that disputes Proffitt's and Barry's statements that they were designated as spokespersons by DHS before the MPR interview.[4] *See Reid*, 522 N.W.2d at 347 (stating that "the uncontroverted evidence shows that the University designated [three administrators] as spokespersons"). Harlow also does not dispute the statement of Proffitt's former supervisor that "[c]orresponding with staff in response to press coverage of the facility was one of Proffitt's job-related functions." Harlow merely avers that Proffitt and Barry spoke outside of their assigned duties. *See DLH, Inc.*, 566 N.W.2d at 71 ("[T]he party resisting summary judgment must do more than rest on mere averments.").

Because we conclude that Proffitt and Barry made their statements as part of their assigned functions, we next consider whether the public interest is furthered by allowing them to speak on this subject. *See Reid*, 522 N.W.2d at 347; *see also Minke*, 845 N.W.2d at 183 (stating that we only extend absolute privilege "based on a compelling public policy interest").

In *Redwood Cnty. Tel. Co. v. Luttman*, we concluded that a sheriff's statements about a 911 emergency telephone system were protected by absolute privilege in order to "serve the public good by keeping the public informed of the public's business." 567

---

[4] Harlow cites the presence of a DHS spokesperson at the MPR interview as evidence that Proffitt and Barry were not designated spokespersons. But the record contains no reference to a DHS spokesperson attending the MPR interview.

18

N.W.2d 717, 721 (Minn. App. 1997) (quotation omitted), *review denied* (Minn. Oct. 21, 1997). Harlow argues that, unlike the sheriff in *Luttman*, Proffitt and Barry "did not provide sound information on an issue of critical public concern." As evidence, Harlow cites allegedly contradictory statements in the February 2012 MPR report, where Barry stated that Harlow was fired for his use of restraints and seclusion, and Proffitt stated that the use of restraints and seclusion was irrelevant to Harlow's firing. But because absolute privilege is available despite the truth or falsity of the speaker's statements, the allegedly contradictory nature of the statements is irrelevant. *See Reid*, 522 N.W.2d at 347. In addition, Harlow argues that his firing was not a matter of public concern. But Proffitt and Barry responded to questions regarding conditions at the security hospital, which, like the 911 system, involved a matter of public concern. *See Luttman*, 567 N.W.2d at 721. And no caselaw suggests that information about employee firings is somehow outside the public interest. *See Reid*, 522 N.W.2d at 347 (providing absolute privilege to statements regarding the actions of two fired university employees).

We conclude that Proffitt and Barry provided the public with important information about a matter of public concern. In *Johnson*, the supreme court provided absolute immunity to a commissioner in part because his statements about a fired state hospital employee involved "the administration of the state hospital system, the use of public funds, the execution of public health care policies, and the welfare of . . . patients in the state hospitals." 315 N.W.2d at 221; *see Buchanan*, 573 N.W.2d at 737 (extending absolute privilege to a program manager's statement about a home health care provider in

part because "the public could have been hurt directly if the care provided was inadequate."). Here, Proffitt and Barry discussed conditions at the security hospital, which is funded and licensed by the state. *See* Minn. Stat. § 253.20 (2014) (discussing DHS's maintenance of the security hospital). The public had a strong interest in learning about the hospital's administration, patient care, and use of public funds. *See Johnson*, 315 N.W.2d at 221. The information about Harlow's firing thus provided important information about hospital operations to the public.

Because Proffitt and Barry were high-ranking officials who made statements integral to their positions about a matter important to the public interest, they are entitled to absolute privilege as a matter of law, and the district court erred by denying summary judgment to them on Harlow's defamation claim.[5]

### D E C I S I O N

Because the data in the employment investigation were public under the MGDPA regardless of the ongoing licensing investigation, the district court erred by denying summary judgment to appellants on Harlow's MGDPA claims. The district court also erred by denying summary judgment to appellants on Harlow's defamation claim because Proffitt and Barry are entitled to absolute privilege.

**Reversed.**

---

[5] Because we determine that appellants qualify for absolute privilege and are entitled to summary judgment, we need not address their alternative qualified-privilege argument.

20