**Travis M. MINKE, Respondent,**

v.

**CITY OF MINNEAPOLIS, et al., Appellants.**

No. A12–2272.

Supreme Court of Minnesota.

April 9, 2014.

---

Joshua G. Hauble, Minneapolis, Minnesota, for respondent.

Susan L. Segal, Minneapolis City Attorney, Sara J. Lathrop, Kristin R. Sarff, Assistant City Attorneys, Minneapolis, Minnesota, for appellants.

## OPINION

LILLEHAUG, Justice.

Believing he was defamed by Minneapolis Police Department Sergeant Janice Callaway during an employment-related background investigation, Travis M. Minke sued Sergeant Callaway and the City of Minneapolis (collectively, appellants) for intentional interference with prospective economic advantage and for defamation. Appellants moved for summary judgment. The district court granted the motion with respect to the intentional interference claim but allowed the defamation claim to proceed. The court of appeals affirmed, *Minke v. City of Minneapolis*, No. A12–2272, 2013 WL 3968762 (Minn.App. Aug. 5, 2013), and we granted review. The issue is whether absolute privilege applies to Sergeant Callaway's statements. Because we conclude it does not, we affirm.

## I.

Between October 2006 and December 2007, Minke worked as a Community Service Officer (CSO) for the Minneapolis Police Department. One of the purposes of Minke's employment was to receive the training necessary to be admitted to the Minneapolis Police Academy. In the meantime, Minke passed the Peace Officer Licensing Exam, which allowed him to apply directly to other agencies for peace officer jobs.

In December 2007, after learning that he would not be permitted to attend the next session of the Minneapolis Police Academy, Minke resigned. Minke applied to other departments, including the Mounds View Police Department, which commenced a background investigation. Minke authorized Mounds View to contact the Minneapolis Police Department, and identified Sergeant Callaway—one of his former supervisors—as the contact.

Mounds View interviewed Sergeant Callaway. Minke alleges that, in the interview, Sergeant Callaway made statements that were defamatory, including "attacks on [his] honesty, integrity, character, work ethic, and performance."[1] Minke further alleges that the statements caused Mounds View not to hire him.

Minke sued appellants for intentional interference with prospective economic advantage and for defamation. On appellants' motion for summary judgment, the district court dismissed the intentional interference claim, but allowed the defamation claim to proceed. The district court concluded that Sergeant Callaway's allegedly defamatory statements were not absolutely privileged because, as a matter of fact, "providing recommendations for former CSOs [was] not part of [Sergeant] Callaway's job duties."

The court of appeals affirmed in an unpublished opinion. *Minke*, 2013 WL 3968762. As did the district court, the court of appeals concluded that absolute privilege did not apply because providing recommendations for former CSOs was not one of Sergeant Callaway's "essential" job duties. *Id.* at *2. The court of appeals also concluded that neither public policy nor Minn.Stat. § 626.87 (2012)—the statute that governs law enforcement background investigations—required extension

---

1. The particular statements and the phrasing of those statements are not relevant to the purely legal issue before us.

of absolute privilege. *Id.* at *3. We granted appellants' petition for further review.

## II.

The only question in this case is whether absolute privilege applies to the allegedly defamatory statements made by Sergeant Callaway. We review de novo this question of law. *See Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 889 (Minn.1986).

## A.

Two types of privilege exist as defenses against defamation claims: absolute privilege and qualified privilege. *Zutz v. Nelson*, 788 N.W.2d 58, 61 (Minn.2010). Both privileges exist because "statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Lewis*, 389 N.W.2d at 889. Absolute privilege bars liability for even "intentionally false statements, coupled with malice," while qualified privilege bars liability only if the "defamatory statements are publicized in good faith and without malice." *Matthis v. Kennedy*, 243 Minn. 219, 223, 67 N.W.2d 413, 416 (1954).

Because of its more robust protections, "[a]bsolute privilege is not lightly granted," *Zutz*, 788 N.W.2d at 62, and is "confined within narrow limits," *Matthis*, 243 Minn. at 223, 67 N.W.2d at 417. We only extend absolute privilege "when public policy weighs *strongly* in favor of such extension." *Zutz*, 788 N.W.2d at 66 (emphasis added).

We do not extend absolute privilege to all speech by government employees related to their work. For example, judges and officers of government whose duties relate to the judicial process enjoy absolute privilege, but only as to statements made in the exercise of their judicial functions. *Bauer v. State*, 511 N.W.2d 447, 450 (Minn.1994). In the legislative context, the Minnesota Constitution grants absolute privilege to members of the State Senate and House of Representatives in the discharge of their official duties. Minn. Const. art. IV, § 10. However, we have consistently declined to extend absolute privilege to all legislative officers, such as those in subordinate government bodies. *E.g.*, *Zutz*, 788 N.W.2d at 63 (declining to extend absolute privilege to unelected watershed district board members).

In the context of executive-branch officials, we have distinguished between top-level and lower-level officers. Top-level officers typically enjoy absolute privilege for statements made in the course of their duties. *E.g.*, *Johnson v. Dirkswager*, 315 N.W.2d 215, 221 (Minn.1982). However, as in the legislative context, we have been reluctant to extend absolute privilege to lower-level officers. In an early case, *Peterson v. Steenerson*, we questioned "the propriety of making the rule universal, and extending [absolute privilege] to all public officers." 113 Minn. 87, 89, 129 N.W. 147, 148 (1910). Accordingly, we confined absolute privilege "to its present limited application," that is, to top-level executive officers. *Id.* at 90, 129 N.W. at 148.

Since deciding *Peterson* more than a century ago, we have been cautious about extending absolute privilege, out of concern that otherwise it "might very well extend to administrative employees serving in countless governmental bureaucracies," *Zutz*, 788 N.W.2d at 65. Only once have we carved out an exception for lower-level executive officers, and then only a narrow one. In *Carradine v. State*, we determined that a state trooper—a lower-level executive officer—enjoyed absolute privilege for allegedly defamatory statements made in an arrest report. 511 N.W.2d 733, 736–37 (Minn.1994). We at-

tached "great significance" to the following factors:

(a) It is a key part of an arresting officer's job to prepare a written arrest report accurately summarizing the circumstances leading to and surrounding the arrest; (b) the report typically is useful not only to the officer's departmental superiors but also to the prosecutor in determining whether to charge the arrestee and, if so, what offense(s) to charge; (c) moreover, the police report often plays a significant role in the trial of a criminal defendant, with the prosecutor using the report to refresh the officer's recollection and with defense counsel using the report to cross-examine and attempt to impeach the officer; and (d) the knowledge that making statements in the report subjects the officer to possible civil liability in a defamation or similar action may well deter the honest officer from fearlessly and vigorously preparing a detailed, accurate report and increase the likelihood that the officer will hesitate to prepare anything more than a bland report that will be less useful within the department and in any subsequent prosecution and trial.

*Id.* at 736.

In extending absolute privilege to the statements made by the state trooper in the arrest report, we made clear that we were not extending such privilege to all statements made by peace officers. Indeed, in *Carradine*, we declined to extend absolute privilege to statements to the press made by the same state trooper. *Id.* at 737. We noted that the media statements were not "essential" to the performance of the state trooper's function as an officer, and that state patrol policy did not require him to make such statements. *Id.*

Similarly, in *Bauer v. State*, a decision issued the same day as *Carradine*, we declined to extend absolute privilege to employment evaluations by lower-level government employees. 511 N.W.2d at 450. *Bauer* involved written statements made by the plaintiff's supervisors that evaluated plaintiff's job performance at the Faribault Regional Treatment Center. *Id.* at 448. We explained that the "administrative personnel matter" at issue did "not raise public policy considerations of the same urgency as *Carradine*." *Id.* at 450.

To summarize, we have only once extended absolute privilege to lower-level executive officers. We did so only in the context of arrest reports, based on a compelling public policy interest, taking into account "the nature of the function assigned to the officer and the relationship of the statements to the performance of that function." *Carradine*, 511 N.W.2d at 736.

### B.

■ Applying our precedent, we decline to extend the absolute privilege for statements made in arrest reports, as recognized in *Carradine*, to the allegedly defamatory statements made by Sergeant Callaway in response to a law enforcement background investigation. Instead, we follow our long-established rule from *Peterson*, for three reasons.

First, arrest reports are materially different from responses to background investigations. In *Carradine*, what tipped the scales in favor of absolute privilege was the role a police report plays in "determining whether to charge the arrestee" and in "the trial of [the] criminal defendant." 511 N.W.2d at 736. A police report is a gateway to the judicial system. By contrast, Sergeant Callaway's statements are not connected to the judicial system but are more like the "administrative personnel matter" in *Bauer*.

Second, Sergeant Callaway's statements were made in the context of an employ-

184

ment-related background investigation in which, typically, a qualified privilege, not an absolute privilege, is recognized. In the seminal case of *Stuempges v. Parke, Davis & Co.*, we weighed the competing interests and concluded, generally, that a qualified privilege is appropriate in connection with employment references. 297 N.W.2d 252, 257 (Minn.1980). We acknowledged that "[i]t is certainly in the public interest that [information about a former employee] be readily available to prospective employers." *Id.* Nevertheless, we recognized that it is "important to protect the job seeker from malicious undercutting by a former employer." *Id.* at 258. Public employee background checks implicate the same considerations.

Further, while neither statute controls here, we note that twice the Legislature has expressed a preference for a qualified privilege in employment-related background investigations. Minnesota Statutes § 181.967, subd. 2 (2012), creates a qualified privilege in certain types of employment references, including by public employers. Minnesota Statutes § 626.87, subd. 4, specifically covers law enforcement background investigations and extends a qualified privilege to private employers that respond to such inquiries. The record in this case does not support a different standard for public employers.

Third, as the district court found and the court of appeals noted, there is nothing in the record to suggest that, like the arrest report in *Carradine*, Sergeant Callaway's statements were made in the performance of an "essential" job duty. Indeed, as the district court determined, even though Sergeant Callaway responded to Mounds View, she did not respond to a similar inquiry from another department. Just as the state trooper in *Carradine* was allowed, but not required, to speak to the press (and thus enjoyed only a qualified

privilege), *cf.* 511 N.W.2d at 736, it appears that Sergeant Callaway was allowed to respond to law enforcement background investigations, but was not required to do so.

To summarize, we do not view absolute privilege as necessary to vindicate the public policy interests at issue in this case. By so holding, in no way do we diminish the importance of Minnesota's peace officers. Qualified privilege, which has been the rule for more than a hundred years, allows Minnesota law enforcement agencies both to conduct searching background investigations and to respond—with candor that is not false and malicious—to those conducted by others. Nothing in this record suggests that qualified privilege will prevent agencies from investigating, hiring, and retaining highly qualified peace officers.

Accordingly, there is no strong reason, *see Zutz*, 788 N.W.2d at 66, to extend absolute privilege to the statements at issue here.

Affirmed.