STATE OF MINNESOTA

IN SUPREME COURT

A14-1342

Court of Appeals                                                            Dietzen, J.
                                          Concurring in part and dissenting in part,
                                                      Anderson and Lillehaug, JJ.
                                                          Took no part, Chutich, J.

Michael Harlow,
                    Appellant,

vs.                                                              Filed: August 10, 2016
                                                            Office of Appellate Courts
State of Minnesota
Department of Human Services, et al.,

                    Respondents.
                          _____

Gregg M. Corwin, Grant S. Gibeau, Gregg M. Corwin & Associate Law Office P.C., Saint
Louis Park, Minnesota, for appellant.

Lori Swanson, Attorney General, Althea M. Huyser, Assistant Solicitor General, Michael
Goodwin, Assistant Attorney General, Saint Paul, Minnesota, for respondents.

                          _____

S Y L L A B U S

1.      Personnel data consisting of an employment investigation report that is
reclassified as public upon the final disposition of an employee disciplinary action in
accordance with Minn. Stat § 13.43, subd. 2(a)(5) (2014) remains public, even though the
data are duplicative of data that are part of a maltreatment investigation classified as
confidential under Minn. Stat. § 13.46, subd. 3 (2014).

1

2. A deputy commissioner of the Department of Human Services, whose position and duties are set forth in Minn. Stat. § 15.06, subd. 7 (2014), is entitled to the protection of absolute privilege when making statements within the scope of his or her statutory authority because the deputy commissioner functions as a top-level, cabinet-equivalent official under our case law.

Affirmed in part, reversed in part, and remanded.

O P I N I O N

DIETZEN, Justice.

Appellant Dr. Michael Harlow, a board-certified psychiatrist, brought suit against respondents for alleged violations of the Minnesota Government Data Practices Act (MGDPA) and common law defamation, based on statements made by the individual respondents regarding the termination of Harlow's employment at the Minnesota Security Hospital (MSH) in Saint Peter, Minnesota. Respondents moved for summary judgment on the basis that: (1) there was no violation of the MGDPA because the statements made were based upon public information, and (2) the individual Respondents have an absolute or qualified privilege. The district court denied the motion, concluding issues of fact precluded summary judgment. The court of appeals reversed, and we granted review. For the reasons that follow, we affirm in part, reverse in part, and remand to the court of appeals for further proceedings.

The relevant facts are undisputed. Dr. Michael Harlow is a board-certified psychiatrist previously employed at the MSH located in Saint Peter, Minnesota, a

Department of Human Services (DHS) facility. David Proffitt was the administrator at the hospital and Ann Barry was a deputy commissioner of DHS.

On November 15, 2011, Harlow was on call at the hospital when a vulnerable adult patient became very violent. The patient was placed in a "seclusion room" and Harlow was summoned. By the time Harlow arrived, the patient was destroying items in his room, threatening a nurse, cutting himself with a piece of broken plastic, and blocking his window and door with his mattress. Harlow ordered the patient's personal items and mattress removed from his room and the patient restrained. When two improvised blades were found, a full weapons search was ordered, and the patient's clothing was removed. After releasing the patient from restraints, MSH staff attempted to provide him with a tear-proof gown, which took some time because the patient was uncooperative. Over the following hours, the patient's mattress and some of his belongings were returned.

Following the incident, the MSH commenced an internal investigation, and the DHS's Division of Licensing commenced a maltreatment investigation. The MSH assembled a four-person internal review committee that was given the responsibility of investigating Harlow's handling of the incident and making recommendations. The focus of the investigation was to determine whether disciplinary action against Harlow was warranted. An internal investigation report was completed on December 8, 2011, and was supplemented on January 6, 2012. On December 20, 2011, Proffitt informed Harlow that his "values were not consistent with the direction of where DHS was going," and Harlow's employment was terminated.

The Licensing Division's maltreatment investigation reviewed the treatment of the patient by staff during the November 15 incident. A maltreatment investigation report, which was issued on May 24, 2012, concluded that suspicions of maltreatment of a vulnerable adult patient by Harlow and DHS staff were "substantiated as to abuse and neglect." Pursuant to Minn. Stat. § 626.557, subd. 9d (2014), Harlow requested reconsideration of that decision. The Division of Licensing later reissued its report and changed its determination with respect to Harlow's responsibility for maltreatment of a vulnerable adult from "substantiated" to "inconclusive."

On February 28, 2012, Minnesota Public Radio (MPR) published a news report that addressed potential licensing issues at MSH.[1] Harlow, Barry, and Proffitt were interviewed for the report. The DHS was contacted for comment, and Barry and Proffitt spoke for the agency in the interview. The news report quoted Barry as stating, "We just need to be very clear that we will no longer allow anyone, staff or . . . psychiatrists, to work in such a way that they aren't complying with our policies around restraint and seclusion." Further, Barry stated that, "Harlow was fired because he inappropriately used restraints and seclusion." According to the news report, Proffitt stated:

> [T]he decision to fire Harlow had nothing to do with restraints or seclusion . . . . However, . . . staff should have returned the patient's clothes more quickly. [The patient] was maintained in a dehumanizing condition for hours without clothing, without [a] blanket, without a mattress, without a pillow, even though it was documented he was trying to sleep on the slab and

---

[1] *See* Madeleine Baran, *State Facility for Mentally Ill Risks Losing License over Turmoil*, Minnesota Public Radio News, Feb. 28, 2012, http://www.mprnews.org/story/2012/02/28/minnesota-security-hospital-turmoil.

was calm and quiet . . . .  Those are things that are not common for this facility.  They're not acceptable for this facility.

Proffitt subsequently sent an email to DHS State Operated Forensic Services staff dated February 29, 2012 that stated:

A recent newspaper article refers to the separation of employment with Dr. Harlow and his claims that he was treated unfairly . . . .  A violation of an individual's rights[,] i.e., maintaining a vulnerable person in a denuded state for multiple hours without adequate justification[,] required the separation of employment.

A second MPR news report was published on June 8, 2012.[2]  The second report indicated that a state maltreatment investigation "found the facility and Dr. Harlow violated licensing standards, but that the violations were not serious or recurring."  Further, the news report stated that Barry "was surprised that the licensing division did not classify the violation as serious," and that she stated, "[t]here are human rights violations there."

Harlow brought a lawsuit against respondents, alleging defamation and violations of the MGDPA, based upon the statements made by Proffitt and Barry in February and June of 2012 and Proffitt's email to DHS staff in February 2012.  Respondents brought a motion for summary judgment arguing that there was no violation of the MGDPA because the statements made by the individual respondents were based on information that was already public.  Specifically, respondents argued that the statements concerned material reclassified as public under Minn. Stat. § 13.43, subd. 2(a)(5) (2014).  Further, respondents

---

[2]    *See* Madeleine Baran, *Investigation Shows Complexity of Caring for the State's Most Violent and Mentally Ill Adults*, Minnesota Public Radio News, June 8, 2012, http://www.mprnews.org/story/2012/06/08/investigation-finds-patient-suffered-maltreatment-at-minnesota-security-hospital.

argued that the doctrine of absolute or qualified privilege applied to the statements of the individual respondents, and therefore the defamation claim should be dismissed. The district court denied the motion, concluding that there were fact issues regarding all of the claims that precluded summary judgment.

The court of appeals reversed the district court, concluding that government data that are reclassified as public under Minn. Stat. § 13.43, subd. 2(a)(5) are public even if they are simultaneously classified as private under Minn. Stat. § 13.46, subd. 3 (2014). *Harlow v. State Dep't of Human Servs.*, 862 N.W.2d 704, 710-14 (Minn. App. 2015). The court also held that the individual respondents, Barry and Proffitt, have an absolute privilege. *Id.* at 714-16.

I.

Harlow first argues that the court of appeals erred in its determination that the dissemination of his private personnel data did not violate the MGDPA. According to Harlow, personnel data is private, and its disclosure violates the MGDPA.

The interpretation of the MGDPA is a question of law that we review de novo. *Helmberger v. Johnson Controls, Inc.*, 839 N.W.2d 527, 531 (Minn. 2013). The goal of all statutory interpretation "is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2014). When interpreting a statute, "we give words and phrases . . . their plain and ordinary meanings." *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 72 (Minn. 2012). Further, we read the statute as a whole and give effect to all its provisions. *Id.*

6

The MGDPA regulates "[a]ll government data collected, created, received, maintained or disseminated by a government entity. . . ." Minn. Stat. § 13.03, subd. 1 (2014). Further, the MGDPA creates a presumption that "government data are public and are accessible by the public for both inspection and copying unless there is federal law, a state statute, or a temporary classification of data that provides that certain data are not public." Minn. Stat. § 13.01, subd. 3 (2014).

Generally, government data falls into one of two main categories: (1) " 'data on individuals,' mean[ing] government data in which any individual is or can be identified as the subject of that data," Minn. Stat. § 13.02, subd. 5 (2014); and (2) "data not on individuals," meaning all other government data, Minn. Stat. § 13.02, subd. 4 (2014). The MGDPA classifies data from each of these two categories into different levels of access. The levels of access for data on individuals are public, private, and confidential. Minn. Stat. § 13.02, subds. 3, 12, 15 (2014). The levels of access for data not on individuals are public, nonpublic, and protected nonpublic. Minn. Stat. § 13.02, subds. 9, 13, 14 (2014).

A.

Essentially, Harlow makes three arguments which we will address in turn. First, Harlow argues that the data contained in the employment investigation report that the individual respondents relied upon to make their statements was private personnel data, and therefore its disclosure violated the MGDPA. Respondents counter that the employment investigation report was public at the time the statements were made.

Generally, all government data are public and accessible to the public under Minn. Stat. § 13.01, subds. 1, 3 (2014) unless otherwise provided by law. *Johnson v. Dirkswager*,

7

315 N.W.2d 215, 221-22 (Minn. 1982). Minnesota Statutes § 13.43 (2014) governs the disclosure of personnel data, and subdivision 2(a)(5) provides, in relevant part, that "the final disposition of any disciplinary action together with the specific reasons for the action and data documenting the basis of the action, excluding data that would identify confidential sources who are [public] employees," is public data. Minn. Stat. § 13.43, subd. 2(a)(5). Subdivision 2(b) states that "a final disposition occurs when the government entity makes its final decision about the disciplinary action, regardless of the possibility of any later proceedings or court proceedings."

We conclude that the employment investigation report and supplement constitute a final decision under Minn. Stat. § 13.43, subd. 2(a)(5) because they document the specific reasons for the termination and document the basis for the decision to terminate Harlow. The purpose of the employment investigation of Harlow was to determine whether disciplinary action was warranted. The final disposition of the employment investigation occurred when Harlow's employment was terminated on December 20, 2011, which is the date when the DHS made its final decision in the matter. Consequently, the employment investigation report was reclassified from private to public on that date and therefore its disclosure did not violate the MGDPA.

B.

Harlow next argues that even if the data in the employment investigation report was reclassified as public under Minn. Stat. 13.43, subd. 2(a)(5), that data remained confidential in the DHS licensing report under Minn. Stat. § 13.46, subd. 3, and therefore the respondents were prohibited from disclosing it. Harlow's argument requires that we

8

determine whether the MGDPA is violated when a person or governmental entity discloses data that is classified as public for one purpose and confidential for another purpose. *See* Minn. Stat. § 13.43, subd. 2(a); Minn. Stat. § 13.46, subd. 3.

Minnesota Statutes § 13.46, subd. 2(a) (2014), generally covers data "collected, maintained, used or disseminated by the welfare system," which (with certain statutory exceptions) is classified as private. Subdivision 3, which is entitled "investigative data," covers the DHS maltreatment investigation in this case. It provides that government data "collected, maintained, used, or disseminated by the [DHS] in an investigation authorized by statute, and relating to the enforcement of rules or law are confidential data on individuals pursuant to section 13.02, subdivision 3 . . . ." Minn. Stat. § 13.46, subd. 3(a). It is undisputed that the maltreatment investigation falls within the scope of subdivision 3. The maltreatment investigation was ongoing at the time the statements were made, and thus the contents of the licensing report remained confidential. Minn. Stat. § 13.46, subd. 3.

The relevant provisions of sections 13.43 and 13.46 do not directly resolve the question of whether personnel data that is simultaneously classified as public for one purpose and classified as confidential for another purpose is disclosable to the public. But the MGDPA provides a framework for resolving the classification of data when the Act is silent on the topic. Specifically, the MGDPA "establishes a presumption that all governmental data are public . . . unless there is a federal law, a state statute, or temporary classification that provides that the data are not public." Minn. Stat. § 13.01, subd. 3. A legal presumption "is a rule of law by which the finding of a basic fact gives rise to a

9

presumed fact capable of being rebutted." *See Presumption*, Garner's Dictionary of Legal Usage (3d ed. 2011); *accord Presumption*, Black's Law Dictionary (10th ed. 2014).

We conclude that personnel data consisting of an employment investigation report that is reclassified as public upon the "final disposition of an[] [employee] disciplinary action" in accordance with Minn. Stat. § 13.43, subd. 2(a)(5) remains public even though the data is duplicative of data in a maltreatment investigation that is classified as confidential under Minn. Stat. § 13.46, subd. 3. Two reasons support our conclusion. First, there is no federal law or temporary classification that provides that the data is not public. When there is a final disposition of a disciplinary action under section 13.43, subdivision 2(a)(5), the personnel data is reclassified as public and is available to the public.

Second, our interpretation gives effect to the provisions of both statutes. Specifically, the employment investigation data is public pursuant to section 13.43, subdivision 2(a)(5), and the data in the maltreatment investigation remains confidential pursuant to section 13.46, subdivision 3. We acknowledge that it may seem anomalous to have data classified as public for one purpose, and confidential for another purpose. But we see nothing in the text of the MGDPA that prohibits this outcome.

C.

Harlow also argues that there are genuine issues of material fact as to the source of some of the data disclosed by the individual respondents that precludes summary judgment. Specifically, Harlow argues there is confidential data contained in the DHS maltreatment investigation report that was improperly disclosed. Because we conclude that Harlow has

failed to produce any credible evidence that the individual respondents relied upon the confidential report in making their statements, his claims relating to this data fail.

We review decisions granting summary judgment to determine "whether there are genuine issues of material fact that preclude summary judgment and whether the [district] court properly applied the law." *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 581 (Minn. 2010). In doing so, we view the evidence in the light most favorable to the party against whom summary judgment was granted. *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn. 2009). We review a district court's application of the law de novo. *Dykes*, 781 N.W.2d at 581.

Harlow argues that two of Barry and Proffitt's statements relied on confidential data sourced from the DHS maltreatment investigation. According to Harlow, both statements concern subject matter that was not included in the employment investigation report, but appeared in the DHS maltreatment report. The first statement is from Proffitt's e-mail to DHS employees, in which he discussed Harlow's termination. There, Proffitt wrote that "[a] violation of an individual's rights[,] i.e., maintaining a vulnerable person in a denuded state for multiple hours without adequate justification[,] required the separation of [Harlow's] employment." The second statement was made by Barry and published in the February 28, 2012 MPR article. Barry said, "We just need to be very clear that we will no longer allow anyone, staff or . . . psychiatrists, to work in such a way that they aren't complying with our policies around restraint and seclusion." Harlow notes that the DHS maltreatment report discussed those policies in detail and determined that they were not followed.

11

For two reasons, we reject Harlow's assertion that these statements necessarily relied on data sourced solely from the DHS maltreatment investigation. First, it appears that these statements may simply reflect the personal opinions and mental impressions of Proffitt and Barry. The opinions and mental impressions of a person do not constitute government data, and thus their disclosure does not violate the MGDPA. *Navarre v. S. Wash. Cty. Sch.*, 652 N.W.2d 9, 25 (Minn. 2002). Second, there is no evidence in the record to support Harlow's assertion that Barry and Proffitt relied upon the DHS maltreatment investigation when making these statements. In support of his argument, Harlow relies on portions of the deposition testimony filed in this case, but that testimony leads to the opposite conclusion. According to their deposition testimony, neither Barry nor Proffitt worked in DHS's licensing division, and they both testified that they were unfamiliar with the contents of the DHS maltreatment investigation report. Barry testified that at the time the investigation was occurring, she "could no longer supervise the licensing activities of the agency" because her time was taken up with overseeing the MSH. In her testimony, Barry maintained that her public comments were based on the employment investigation.

In his deposition, Proffitt testified that although he was aware that a maltreatment investigation was ordered by DHS, he did not know who had ordered it. Proffitt testified, "[A]t the time [of the maltreatment investigation] I wasn't aware of what licensing was doing." The DHS employee who conducted the maltreatment investigation testified in a deposition that while the investigation was ongoing, she had no contact with Barry and was unsure if she had any contact with Proffitt.

12

We conclude that Harlow has failed to produce any credible evidence that the individual respondents relied upon confidential data in the maltreatment investigation report to make their statements to MPR, or in Proffitt's email. In the absence of any such evidence, we conclude that the district court did not err when it granted summary judgment to the respondents on Harlow's MGDPA claim. Barry's and Proffitt's statements did not violate the MGDPA.

## II.

Harlow next argues that the court of appeals erred in concluding that respondents Barry and Proffitt are entitled to the protection of absolute privilege with respect to the defamation claim. According to Harlow, the district court was correct to conclude that there were disputed facts as to whether Proffitt and Barry were of sufficient rank to qualify for absolute privilege, and whether the substance of their statements touched on matters of public concern. Harlow contends that granting absolute privilege in this situation would be contrary to the policy goals underlying the absolute-privilege doctrine.

We review de novo whether the doctrine of absolute privilege applies in a given situation. *Minke v. City of Minneapolis*, 845 N.W.2d 179, 182 (Minn. 2014); *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 889 (Minn. 1986).

We have recognized two types of privilege as defenses to a defamation claim: absolute privilege and qualified privilege. *Zutz v. Nelson*, 788 N.W.2d 58, 61-62 (Minn. 2010). "[A]bsolute privilege applies without regard to the intent of the speaker," and therefore extends immunity "even for intentionally false statements, coupled with malice while a qualified or conditional privilege" applies only if the statements "are publicized in

13

good faith and without malice." [3] *Id.* at 62 (quoting *Matthis v. Kennedy*, 243 Minn. 219, 223, 67 N.W.2d 413, 416 (1954)).

The Minnesota Constitution grants absolute privilege to members of the State Senate and House of Representatives in the discharge of their official duties. Minn. Const. art. IV, § 10. We have extended absolute privilege to members of the other branches of government in certain circumstances. Specifically, "judges and officers of government whose duties relate to the judicial process enjoy absolute privilege, but only as to statements made in the exercise of their judicial functions." *Minke*, 845 N.W.2d at 182.

We first extended absolute privilege to a superior executive official of state government in *Peterson v. Steenerson*, 113 Minn. 87, 129 N.W. 147 (1910). In *Peterson*, we considered whether the Crookston postmaster was entitled to the defense of absolute privilege in a defamation claim brought by a rural carrier for allegedly defamatory statements made by the postmaster. *Id.* at 88, 129 N.W. at 147. We declined to extend absolute privilege to all public officials on the ground that absolute privilege should only be "applied to the head of one of the executive departments of government" and should not be extended to a postmaster. *Id.* at 89, 129 N.W.2d at 148.

In 1959, the United States Supreme Court decided the seminal case of *Barr v. Matteo*, 360 U.S. 564 (1959). In *Barr*, former employees of the Office of Rent Stabilization brought an action against Matteo, the acting director of the federal agency, for allegedly

---

[3] We do not address the question of whether Barry or Proffitt's statements were protected by qualified privilege as that question was not addressed by the court of appeals, and is not before us now.

14

defamatory statements made in a press release announcing his intention to suspend the employees for conduct causing the agency to be criticized. *Id.* at 565-68. The Supreme Court extended the defense of absolute privilege to the statements made by the acting director of the federal agency. *Id.* at 574-75. The Court reasoned that government officials should be free to exercise their duties unencumbered by the fear of damage suits for acts performed in the course of those duties. *Id.* at 571. The Court did not limit the principle to executive officers of cabinet rank, reasoning that:

> The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

*Id.* at 572-73. The Court observed that "it is not the title of [the] office but the duties with which the particular officer" is entrusted that matter. *Id.* at 573. The Court later extended the absolute executive privilege to inferior executive officers of the United States. *See Howard v. Lyons*, 360 U.S. 593 (1959).

We relied upon *Barr v. Matteo* to extend the privilege to certain state government officials in two relevant cases. *Carradine v. State*, 511 N.W.2d 733, 736 (Minn. 1994); *Dirkswager*, 315 N.W.2d at 221. In *Dirkswager*, an assistant group supervisor at the state hospital brought an action for defamation against the commissioner of public welfare. 315 N.W.2d at 217. To determine if absolute privilege should be extended, we examined whether the person was a superior executive official of state government and whether the statements were made within the scope of the official's duties. *Id.* at 220-221. We quoted

15

the Restatement (Second) of Torts § 591(b) (Am. Law Inst. 1977), for the proposition that an absolute privilege exists for "a governor or other superior executive officer[] of [the] state." *Dirkswager*, 315 N.W.2d at 220. We also noted the comment to the Restatement, which explains that all state courts that have considered the issue agree the privilege in question "protects the superior officers of state governments, including at least the governor, the attorney general or the heads of state departments whose rank is the equivalent of cabinet rank in the Federal Government." *Id.* We held that the Commissioner of the Minnesota Department of Public Welfare holds a "high-level cabinet-equivalent position in state government," *id.* at 220, and therefore is entitled to absolute privilege. *Id.* at 223. We reasoned that the goal of holding governmental officials accountable is best served by assuring that the official is free to speak out in the performance of his or her duties. *Id.* at 221. And we explicitly stated that the determination of "the nature or extent of any privilege for inferior governmental officials" was not before us. *Id.*

In *Carradine*, we considered whether absolute privilege should be extended to a lower-level governmental official. 511 N.W.2d at 736-37. We reaffirmed our decision in *Dirkswager* that a high-level executive official of state government is entitled to absolute immunity for statements made in the course of official duties. But whether a police officer is entitled to absolute immunity for statements made in an arrest report—the factual circumstance presented in that case—required examination of additional factors including the officer's responsibility to prepare the arrest report and the function of the report itself. *Id.* We held that a police officer has absolute immunity from a defamation lawsuit for statements made in a written police report. *Id.* We reasoned that the police report is often

16

a critical part of the law enforcement process at the prosecutorial charging stage and at trial. *Id.* at 736. Because of the importance of complete, detailed arrest reports, we concluded that police officers should be free of the threat of civil defamation lawsuits based on the content of their reports. *Id*. at 736-37.

Our recent decisions on absolute privilege involving lower-level governmental officials confirm the scope of our decisions in *Dirkswager* and *Carradine*. *See Minke*, 845 N.W.2d at 183-84 (when considering whether to extend absolute privilege to a police sergeant who was clearly a lower-level official, we examined additional factors, including that the statement in question was made in the context of an "employment-related background investigation" and not during the performance of an "essential job duty"); *Zutz*, 788 N.W.2d at 63-65 (when deciding whether to extend absolute privilege to lower-level governmental officials such as members of a watershed district board, we examined broader public policy considerations, including whether the official is elected).

In sum, we have extended absolute privilege to a cabinet-equivalent state governmental official for statements made in the course of his or her official duties. The underlying rationale is that a cabinet-level state governmental official is responsible for the operation of a state agency and the official should be free to speak on matters relating to the operation of the agency without fear of civil liability. We have not, however, extended absolute privilege to a lower-level governmental official of a local unit of government such as a county board, watershed commission, or city council. We have only extended absolute privilege to a lower-level official in the narrow situation of a police officer who prepares

an arrest report, and there only because of the unique and essential role an arrest report plays in charging decisions and criminal trials. *Carradine*, 511 N.W.2d 736-37.

With these principles in mind, we return to the question of whether absolute privilege should be extended to Barry and Proffitt. During the relevant period, Barry was a deputy commissioner of DHS.[4] The powers and authority of a deputy commissioner of DHS are set forth in Minn. Stat. § 15.06, subd. 7 (2014). Subdivision 7 provides that:

> [a] deputy commissioner of a department or agency specified in subdivision 1 shall be in the unclassified civil service and shall be immediately subordinate to the commissioner. *The deputy commissioner shall have all the powers and authority of the commissioner unless the commissioner directs otherwise, and shall speak for the commissioner within and without the department or agency.* The primary duty of a deputy shall be to assist the commissioner in the general management of the entire department or agency or of major parts thereof, and shall not consist of operating single functional areas. A deputy commissioner serves at the pleasure of the commissioner.

*Id.* (emphasis added).

When Barry was interviewed by MPR, she had all the statutory power and authority of the commissioner, including the specifically enumerated power to speak for the commissioner. And Barry spoke on a topic within the scope of her duties as deputy commissioner. The topic of the interview touched on the administration of MSH, the expenditure of public monies, and the welfare of the mentally ill. As the deputy

---

[4] "Unless specifically authorized by statute, other than section 43A.08, subdivision 2, no department or agency specified in subdivision 1 shall have more than one deputy commissioner," subject to certain exceptions not applicable here. Minn. Stat. § 15.06, subd. 8 (2014). Minnesota Statutes § 245.03, subd. 1 (2014) authorizes two deputy commissioners in DHS.

commissioner, Barry had the responsibility to assist the commissioner of DHS in the general management of the agency. Moreover, there is no evidence that the Commissioner of DHS withdrew any of Barry's power or authority under the statute. Clearly, the topic was a matter of public interest.

We conclude that a deputy commissioner of DHS, whose position and duties are defined by Minn. Stat. § 15.06, subd. 7, is entitled to the protection of absolute immunity when making statements within the scope of his or her statutory authority.[5] The deputy commissioner of DHS functions as a top-level cabinet-equivalent official within the

---

[5] The concurrence and dissent suggests that Barry is "unelected," and "not accountable to the public." This argument is flawed for two reasons. First, our case law does not require that a state government official be elected in order to be entitled to the protection of absolute privilege. Indeed, all Minnesota cabinet-level officials are appointed by the governor, not elected. It is true that a commissioner is confirmed by the Senate, but that requirement is established by the Legislature. Minn. Stat. § 15.06, subd. 2. Because the Legislature has the authority to establish the position and duties of the commissioner, it logically follows that the Legislature has the authority to establish the position and duties of the deputy commissioner. Moreover, both the commissioner and deputy commissioner are accountable to the public, and are required to answer inquiries from the public regarding their management of DHS. Indeed, it was in the course of answering inquiries from the public, and thereby providing accountability through the political process, that Barry made the remarks of which Harlow complains. Although the deputy commissioner does not directly report to the governor, the deputy commissioner is ultimately responsible to the governor.

Second, to determine whether absolute privilege should be extended to a state official our case law first examines whether the individual is a cabinet-equivalent governmental official. *Carradine*, 511 N.W.2d at 735; *Dirkswager*, 315 N.W.2d at 220-21. To make that determination we examine the duties of the position that are established by the Legislature. If we determine that a position is cabinet-equivalent, then there is no need to address the more rigorous inquiry applicable to lower-level governmental officials. Here, the deputy functions as the cabinet-equivalent of the commissioner of DHS and consequently there is no need to explore additional factors applicable to a determination of whether absolute privilege extends to a lower-level official.

19

meaning of our case law.  *Carradine*, 511 N.W.2d at 736-37; *Dirkswager*, 315 N.W.2d at 220-23.  Specifically, the deputy commissioner assists the commissioner in the general management of DHS.  To accomplish the duties and responsibilities of the position the deputy commissioner has the power and authority of the commissioner of DHS, and has the authority to speak for the commissioner.[6]  Minn. Stat. § 15.06, subd. 7.

Our decision is consistent with the decisions of other state courts that have considered the issue.  The majority of state courts that have considered the question have agreed that absolute privilege protects the superior officers of state governments, including the heads of state departments whose rank is the equivalent of cabinet rank in the federal government.  *See, e.g.*, *Adams v. Tatsch*, 362 P.2d 984, 988-89 (N.M. 1961) (concluding that remarks made by a member of the state Highway Commission in the exercise of his duties was absolutely privileged); *Lombardo v. Stoke*, 222 N.E.2d 721, 723-724 (N.Y. 1966) (concluding that the members of the state Board of Higher Education are protected by absolute privilege when performing their duties).  The focus of these cases has consistently been on the duties of the particular official.

---

[6]      The concurrence and dissent suggests that our decision opens the door to a commissioner extending absolute privilege to mid-level bureaucrats by designating them as qualified to speak on behalf of the commissioner.  We disagree.  Specifically, we only extend absolute privilege to the deputy commissioner of DHS, who satisfies the criteria of Minn. Stat. § 15.06, subd. 7, and therefore is a cabinet-equivalent governmental official.  Our decision rests on the statutory designation by the Legislature of the positions of commissioner and deputy commissioner.  *See generally* Minn. Stat. § 15.06 (2014) (providing procedures to appoint department heads of administrative agencies, terms of office, provisions for vacancy, the powers and number of deputy commissioners, etc.).

We decline, however, to extend absolute privilege to Proffitt. Proffitt was not a cabinet-level executive official of the state government when the statements were made and the email was sent. *Carradine*, 511 N.W.2d at 736-37; *Dirkswager*, 315 N.W.2d at 220-23. There is no statute explicitly vesting Proffitt with all the powers and responsibilities of the DHS commissioner, or empowering him to speak on behalf of the Commissioner. Instead, Proffitt's work entailed overseeing the administration of state-operated forensic services, which consisted largely of running the day-to-day operations of MSH.

Moreover, Proffitt's duties and responsibilities did not fall within the narrow parameters within which we have extended absolute privilege to inferior government officials. Specifically, Proffitt did not have an assigned responsibility to prepare an accurate report for DHS that would be used outside the agency to report what had occurred, to make recommendations regarding the November 15, 2011 incident, or to examine the broader issue of the proper treatment of vulnerable adults in state hospitals. In sum, none of the factors that would support an extension of absolute privilege in *Carradine* apply in Proffitt's case. *See* 511 N.W.2d at 736-37; *see also Bauer v. State*, 511 N.W.2d 447, 450 (Minn. 1994) (concluding that the urgent public policy considerations in *Carradine* are not applicable to an administrative personnel matter). Accordingly, we conclude that Proffitt, as the administrator of state operated forensic services, is not entitled to absolute privilege as a defense against Harlow's defamation claim. As the court of appeals did not consider Proffitt's alternative qualified immunity claim, *Harlow*, 862 N.W.2d at 716 n.5, we remand to that court for consideration of this claim.

Affirmed in part, reversed in part, and remanded.

CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

CONCURRENCE & DISSENT

ANDERSON, Justice (concurring in part, dissenting in part).

I join in Part I of the court's opinion regarding the Minnesota Government Data Practices Act. I also agree with the court's conclusion in Part II of its opinion that David Proffitt is not entitled to absolute privilege, and the court's corollary decision to remand the case for the court of appeals to determine whether a qualified privilege shields Proffitt from liability in this case. I do not agree, however, with the court's decision to provide Deputy Commissioner Anne Barry with an absolute privilege. The court's opinion represents a significant and unprecedented extension of absolute privilege. Because I see no reason, and this dispute offers none, to change the boundaries of absolute privilege, I respectfully dissent.

I.

This case arises from a 2011 incident at the Minnesota Security Hospital in St. Peter ("MSH" or "the hospital") and ensuing events. MSH is a Minnesota Department of Human Services (DHS) facility and the Commissioner of DHS is ultimately responsible for the hospital's operations. Appellant Dr. Michael Harlow is a board-certified psychiatrist who, in 2011, worked at MSH. During all relevant times, respondent David Proffitt was the hospital administrator at MSH and respondent Anne Barry was a Deputy Commissioner of DHS.

On November 15, 2011, a patient became violent and was placed in a "seclusion room." Harlow was notified of the situation and ordered a number of measures, including

C/D-1

the use of restraints, removal of the patient's personal effects, and a full weapons search of the room. Harlow's employment was terminated following an internal investigation of the incident by MSH.

DHS's Licensing Division also initiated an investigation into the incident, but did not publish a report on the matter until May 2012. On February 28, 2012, Proffitt and Barry were quoted in a Minnesota Public Radio (MPR) news report regarding the hospital's licensing situation. *See* Madeleine Baran, *State Facility for Mentally Ill Risks Losing License over Turmoil*, Minnesota Public Radio News, Feb. 28, 2012, http://www.mprnews.org/story/2012/02/28/minnesota-security-hospital-turmoil. Both Proffitt and Barry commented on Harlow's termination, with Barry stating, "Harlow was fired because he inappropriately used restraints and seclusion." *Id.*

In May 2012, the Licensing Division issued a report, finding that suspicions of maltreatment through abuse and neglect of a vulnerable adult patient by MSH and Harlow were "substantiated." When Harlow challenged this finding, however, the Licensing Division issued a revised report, changing its conclusion and stating that the results regarding Harlow's fault in the incident were "inconclusive."

On June 8, 2012, an MPR report noted that the Licensing Division's report "found the facility and Dr. Harlow violated licensing standards, but that the violations were not serious or recurring." *See* Madeleine Baran, *Investigation Shows Complexity of Caring for the State's Most Violent and Mentally Ill Adults*, Minnesota Public Radio News, June 8, 2012, http://www.mprnews.org/story/2012/06/08/investigation-finds-patient-suffered-maltreatment-at-minnesota-security-hospital. The MPR report stated that Barry "was

surprised that the licensing division did not classify the violations as serious," and quoted her as saying, "There are human rights violations there."

Harlow sued both Barry and Proffitt, alleging violations of the Minnesota Government Data Practices Act and a claim of defamation. Harlow's defamation claim was based on the statements made by Proffitt and Barry in the February and June MPR reports and a February 2012 email sent by Proffitt to other DHS personnel. Respondents moved for summary judgment on the defamation claim, arguing that the doctrines of absolute or qualified privilege shielded them from liability in this case. The district court denied the motion, but the court of appeals reversed, concluding that both Barry and Proffitt were entitled to absolute privilege on the defamation claim. *Harlow v. State Dep't of Human Servs.*, 862 N.W.2d 704, 714-16 (Minn. App. 2015).

## II.

I agree with the court's conclusion that Proffitt is not entitled to an absolute privilege. In my view, however, the court significantly and unnecessarily expands the doctrine of absolute privilege by extending an absolute privilege to Deputy Commissioner Barry in this case.

Whether a privilege exists is a question of law, which we review de novo. *See Minke v. City of Minneapolis*, 845 N.W.2d 179, 182 (Minn. 2014). We have previously recognized two distinct privileges that may apply to government employees who make allegedly defamatory statements during the course of their duties. First, we have recognized "a qualified or conditional privilege [that] grants immunity only if the privilege is not abused and defamatory statements are publicized in good faith and without malice."

*Matthis v. Kennedy*, 243 Minn. 219, 223, 67 N.W.2d 413, 416 (1954). Second, we have recognized an absolute privilege that shields the speaker from liability in all circumstances, even if the statements are made with malice. *Id*.

Absolute privilege for legislative officials is a common-law doctrine dating back to at least 1399, and it is enshrined in the Minnesota Constitution, which provides: "For any speech or debate in either house [members of the Legislature] shall not be questioned in any other place." Minn. Const. art. IV, § 6; *see Carradine v. State*, 511 N.W.2d 733, 734-35 (Minn. 1994) (citing *Barr v. Matteo*, 360 U.S. 564 (1959)). Our case law also has provided absolute privilege to various judicial officers who make statements in the course of their duties.[1] *Minke*, 845 N.W.2d at 182.

Almost from our earliest days as a state, however, we have expressed skepticism about providing absolute immunity to members of the executive branch. In *Peterson v. Steenerson*, we doubted "the propriety of making the rule universal, and extending [absolute privilege] to all public officers" and concluded that "the rule of absolute privilege should be confined to its present limited application." 113 Minn. 87, 89-90, 129 N.W. 147, 148 (1910). Our stance on the extremely limited nature of absolute privilege has endured for more than a century. Simply put, "we only extend the absolute privilege to government officials when public policy weighs strongly in favor of such extension." *Zutz v. Nelson*, 788 N.W.2d 58, 66 (Minn. 2010).

---

[1]     This is also consistent with the English common law, which extended absolute privilege to judicial officers as early as the sixteenth century. *See Carradine*, 511 N.W.2d at 735.

In *Johnson v. Dirkswager*, we faced the question of whether absolute privilege was available to the Commissioner of the Department of Human Services, a cabinet-level executive official. 315 N.W.2d 215, 221 (Minn. 1982). We evaluated the federal rule on absolute privilege, which applies absolute privilege to any statements made by a federal officer of any level in the course of his or her duties. *Id*. at 220. We noted that, although the federal rule was well established, the majority of states have only extended absolute privilege to legislators; judicial officers; the governor; and top cabinet-level executive officials. *Id.* (citing Restatement (Second) of Torts § 591 (1977)). But states have generally refused to extend absolute privilege to executive officials below the cabinet level. *Id*.

Although we declined to adopt the federal rule with respect to all members of the executive branch, we held that absolute privilege shields statements by the governor and cabinet-level officials. *Dirkswager*, 315 N.W.2d at 220-21. In providing absolute privilege to the governor and cabinet-level officials, we reasoned that "government can best be held accountable by assuring that its top-level representatives have no excuse not to speak out in the performance of their duties." *Id.* at 221. In other words, when it comes to cabinet-level officials, the public is a more reliable source of accountability than defamation law.

But we have consistently rejected attempts to expand absolute immunity beyond these limits. In *Zutz*, for instance, we declined to extend absolute privilege to an unelected watershed board. 788 N.W.2d at 60. In doing so, we emphasized that, unlike cabinet-level officials, there was insufficient accountability to justify an absolute privilege for unelected watershed board members: "Because there is no direct accountability to the voters for

watershed district board members . . . public criticism is the only vehicle for holding board members accountable. But this fact supports a qualified rather than absolute privilege . . . ." *Id.* at 64.

*Carradine v. State*, 511 N.W.2d 733 (Minn. 1994), is the only decision in which we have provided absolute privilege to an executive officer below the cabinet level. In *Carradine*, we held that absolute privilege applied to statements made by a state trooper in a police report. *Id.* at 736-37. In doing so, we highlighted the special importance police reports play in the judicial process, tying the facts of *Carradine* to our prior precedent regarding absolute privilege in judicial proceedings. *Id.* at 736. At the same time, however, we declined to apply absolute privilege to statements made by the same state trooper regarding the same incident when those statements were made in response to press inquiries. *Id.* at 737. We emphasized that the trooper was permitted, but not required, to respond to press inquiries and, as a result, concluded that public policy did not weigh in favor of providing the trooper with absolute privilege for those statements.[2] *Id.*

In short, our precedent clearly delineates the boundaries of absolute privilege. It also makes clear that the doctrine should be "confined within narrow limits." *Matthis*, 243 Minn. at 223, 67 N.W.2d at 417. Significantly, when we have extended absolute privilege to executive officials, we have focused either on the interrelatedness of the duties of those officials and the judicial process, *see Carradine*, 511 N.W.2d at 736, or we have concluded

---

[2] We have also declined to provide absolute privilege to law enforcement officers when they make statements about applicants to prospective employers, *Minke*, 845 N.W.2d at 183, further buttressing the conclusion that *Carradine* is the very rare exception to the rule that lower-level executive officials are not entitled to absolute privilege.

that the ability of the public to hold cabinet-level officials accountable through the political process was sufficient to prevent abuse of the privilege, *see Dirkswager*, 315 N.W.2d at 221.

Yet today, the court extends absolute privilege to an executive official whose duties are not interrelated with the judicial process and who is not accountable to the public. In justifying its decision, the court relies almost exclusively on the fact that Deputy Commissioner Barry had "all the powers and authority of the commissioner unless the commissioner directs otherwise." Minn. Stat. § 15.06, subd. 7 (2014). The court places particular weight on the fact that, as a Deputy Commissioner, Barry was empowered to "speak for the commissioner within and without the department or agency," unless the Commissioner directed otherwise. *Id.*

There are serious problems with the court's reasoning. First, the court erroneously concludes that Barry is a "cabinet-level official." This is simply not the case. Although Barry held the title of Deputy Commissioner, she did not head a department and her rank was not the " 'equivalent of cabinet rank in the Federal Government.' " *See Dirkswager*, 315 N.W.2d at 220 (quoting Restatement (Second) of Torts § 591 cmt. c (Am. Law Inst. 1977)). Tellingly, the court fails to identify any member of the federal cabinet to whom Barry should be compared.[3]

---

[3] The fact that a Deputy Commissioner position is not the state equivalent of a federal cabinet position should be self-evident. No "Under Secretary of State" or "Under Secretary of Defense" would be taken seriously if he or she attempted to characterize the post as "cabinet level."

The fact that Barry had the authority to act and speak on behalf of the Commissioner does not make her a "cabinet-level official." The court jumps from the fact that Deputy Commissioners have the same default powers as Commissioners to the conclusion that the rank of the positions must be the same. But the concepts of power and rank are distinct. The court's reasoning ignores the reality that whether a position is "cabinet level" is determined by the responsibilities and elements of a position beyond its specific powers. To begin, the court overlooks significant differences in the process for selecting Commissioners and Deputy Commissioners. When we approved absolute privilege for cabinet-level officials in *Dirkswager*, our decision relied heavily on the fact that cabinet-level officials are best held accountable through the political process. 315 N.W.2d at 221. We reiterated the importance of accountability when we declined to provide absolute privilege to an unelected watershed board in *Zutz*. 788 N.W.2d at 65.

Despite this emphasis on accountability, the court's opinion barely acknowledges the significantly different processes through which Commissioners and Deputy Commissioners are selected. The Commissioner of DHS, who is shielded by absolute privilege, must be nominated by the governor and approved by the senate. Minn. Stat. §§ 15.06, subd. 2, 245.03, subd. 1 (2014). Thereafter, a Commissioner serves "at the pleasure of the [governor]." Minn. Stat. § 15.06, subd. 2. Deputy Commissioners of DHS, however, are appointed by the Commissioner alone and serve at the pleasure of the Commissioner alone. Minn. Stat. §§ 15.06, subd. 7, 245.03, subd. 1.

The contrast in the level of accountability between Commissioners and Deputy Commissioners is striking and has profound implications for the effectiveness of the

political process in holding Commissioners and Deputy Commissioners accountable. The Commissioner is selected by the democratically elected governor, must be confirmed by the democratically elected senate, and serves at the pleasure of the governor. Deputy Commissioners, on the other hand, are appointed by an unelected Commissioner and are accountable only to the unelected Commissioner. Far from being accountable to the people through the political process, Deputy Commissioner Barry is a bureaucrat who is substantially insulated from the accountability provided by the political process.

Without the underpinnings of accountability that were present in *Dirkswager*, the court's decision to extend absolute privilege to statements by government officials below the cabinet level is both troubling and potentially expansive. It is worth emphasizing that the powers of the Deputy Commissioner can be altered unilaterally and at any time by the Commissioner. *See* Minn. Stat. § 15.06, subd. 7 (stating that "[t]he deputy commissioner shall have all the powers and authority of the commissioner unless the commissioner directs otherwise . . . ."). The court does not address whether a Deputy Commissioner would still be entitled to absolute privilege if the Deputy Commissioner had some, but not all, of the powers of a Commissioner. These ambiguous determinations are exactly why the bright line of "cabinet-level officials" should not be blurred to include "almost-cabinet-level officials."

This line is blurred even further by Minn. Stat. § 15.06, subd. 6(1) (2014), which authorizes Commissioners "to delegate to any subordinate employee the exercise of specified statutory powers or duties as the commissioner may deem advisable, subject to

the commissioner's control."[4]  Although the court notes that Deputy Commissioner Barry had "all the powers and authority of the commissioner," its decision to extend absolute privilege to officials below the cabinet level based on the official's powers and responsibilities opens the door to further expansion of the doctrine.  This raises the question of where to draw the line.  Does absolute privilege attach when an official, Deputy Commissioner or otherwise, has 70 percent of the Commissioner's power?  Ninety percent?  We do not know.  What we do know is that it would be unnecessary to draw any additional lines if the doctrine of absolute privilege remained confined to cabinet-level officials.

If an official's access to absolute privilege turns on how many of the Commissioner's powers that official holds, the court's reasoning could be employed to provide absolute privilege to an unknown and undefined group of government officials.  Indeed, the most troubling aspect of the court's opinion is that it lays the groundwork for vesting the scope of absolute privilege in unelected Commissioners rather than our court; those Commissioners may soon be able to provide the shield of absolute privilege to their subordinates with the stroke of a pen.

More importantly, the court's opinion fails to explain why absolute privilege is even necessary in this case.  The court simply reasons that, because the Commissioner of DHS is entitled to absolute privilege, a Deputy Commissioner authorized to speak on behalf of the Commissioner must be entitled to the same privilege.  But, as discussed above, there

---

[4]     The only limitations on this power are "that every delegation shall be made by written order, filed with the secretary of state; and further provided that only a deputy commissioner may have all the powers or duties of the commissioner."  Minn. Stat. § 15.06, subd. 6(1).

are significant differences between the position of a Commissioner and a Deputy Commissioner—and there is an even greater difference between a Commissioner and a midlevel bureaucrat to whom the Commissioner has delegated some portion of the Commissioner's power. The court provides no overriding policy concern necessitating the application of absolute privilege to statements made by Deputy Commissioners or anyone else authorized to speak for the Commissioner.[5]

Barry is simply not a "cabinet-level official" and, thus, she is not entitled to absolute privilege under any of our precedents. Given that "we only extend the absolute privilege to government officials when public policy weighs *strongly* in favor of such extension," *Zutz*, 788 N.W.2d at 66 (emphasis added), the absence of a compelling policy interest weighing in favor of extending absolute privilege in this case is noteworthy. It certainly can be argued that the statements at issue here related to a matter of public concern. But there is no reason that the Commissioner of DHS could not have made the statements directly if the Commissioner felt that an absolute privilege was necessary to facilitate comment by the agency. There is no evidence that the public would have been deprived of key information or frank comment by the agency if an absolute privilege was available to the Commissioner alone, and not to Deputy Commissioner Barry.[6]

---

[5] More often, a chief of staff or a communications officer is authorized to speak on behalf of a Commissioner.

[6] Indeed, Barry made these comments in a legal environment in which it was far from certain that Barry had access to an absolute privilege. The court's post hoc extension of that privilege to Barry's circumstances can hardly be judged to have played a significant role in Barry's decision to speak.

In short, it appears that the court's opinion in this case rests almost entirely on its conclusion that Barry's powers as Deputy Commissioner must mean that Barry is entitled to absolute privilege under *Dirkswager*. This erroneous conclusion ignores the underpinnings and rationale of *Dirkswager* and *Zutz*. The court's decision to extend absolute privilege to an unelected and unaccountable bureaucrat in a case in which there is no overriding policy need conflicts with our jurisprudence and creates the real possibility that the absolute privilege doctrine has escaped the "narrow confines" in which we sought to contain it.

III.

I do not mean to suggest that Barry should not be entitled to any protection for statements made during the course of her official duties. Indeed, Barry may have a qualified privilege here. But the extension of absolute privilege—the only question before our court—is a serious matter. As we have recognized, the extension of absolute privilege comes at a cost. "The effect of absolute privilege is to immunize . . . defamatory speech, speech that can be personally crushing and career-ending." *Zutz*, 788 N.W.2d at 64.

Simply put, the unavoidable consequence of expanding any privilege or immunity is that some claims, perhaps even the most meritorious claims, will go uncompensated. In this case, the expansion of absolute privilege—and the corollary denial of meritorious claims—is not justified. As a result, I would remand this case to the court of appeals to determine whether a qualified privilege applies to the statements by Barry and Proffitt.

LILLEHAUG, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Anderson.