BRATVOLD, Judge
This appeal arises from a district court decision setting aside a jury verdict and vacating the resulting judgment in a defamation suit. Appellants Multimedia Holdings Corporation d/b/a KARE 11-TV (KARE 11) and d/b/a the St. Cloud Times (St. Cloud Times) (collectively, appellants) seek review of the district court's decision to grant respondent Ryan Larson a new trial.[1] Larson sued appellants for defamation based on news reports they issued about his arrest following the 2012 murder of a police officer.
We hold (1) the fair-report privilege protected appellants' news reports that accurately summarized and fairly abridged statements made by law enforcement at an official press conference and in an official news release; and (2) the district court erred in vacating the jury's verdict that *488 appellants' statements were not false and in ordering a new trial. Because of these determinations, we do not need to reach other issues raised by appellants. Thus, we reverse the district court's new-trial order, reinstate the jury's verdict, and remand for entry of judgment in favor of appellants.
FACTS
On Thursday, November 29, 2012, at approximately 11:00 p.m., Cold Spring police officer Tom Decker was shot and killed near a bar. Larson lived above the bar, and Decker was following up on a request from Larson's family to check on his welfare because he was possibly suicidal. Police arrested Larson and booked him in the Stearns County jail in connection with the murder. Larson's name and anticipated charge appeared in the jail log; similar information was in an application to detain that was signed by a judge a few days later.
On the morning of November 30, law-enforcement officials held a joint press conference about the shooting, during which Minnesota Bureau of Criminal Apprehension Deputy Superintendent Drew Evans, Stearns County Sheriff John Sanner, and Cold Spring Police Chief Phil Jones made statements and answered questions. While they stressed that the investigation was in its early stages and refused to answer some questions, they stated that police had arrested Larson and that they did not have "any information to believe" that other individuals were involved. They also said it was "apparent" that Decker was "ambushed at the scene."
The Minnesota Department of Public Safety issued a news release on November 30, 2012, stating that "[w]ithin an hour" of the shooting a SWAT team arrested Larson, who "was booked into the Stearns County Jail on murder charges."
Decker's shooting and the investigation that followed were "breaking news" in Minnesota. At least one television station provided live coverage of the joint press conference. While covering the shooting, KARE 11 and the St. Cloud Times made 11 statements that are the focus of Larson's defamation lawsuit.
Statements on November 30 by KARE 11
KARE 11 covered Decker's shooting in its 5:00 p.m., 6:00 p.m., and 10:00 p.m. newscasts on November 30, 2012. During the 6:00 p.m. newscast, KARE 11 reported that Decker "was shot and killed last night while conducting a welfare check on a suicidal man." The report continued: "Police say that man-identified as 34-year-old Ryan Larson-ambushed Officer Decker and shot him twice-killing him." Then, the newscast cut to a reporter who interviewed Decker's mother, and the reporter stated that Decker's mother "holds no ill-will against the man accused of killing her son." The newscast closed by saying, "Ryan Larson, the man accused of killing Officer Decker, could be charged as early as Monday." Larson's mugshot and criminal history accompanied this statement.
During the 10:00 p.m. newscast, KARE 11 opened by stating, "Investigators say 34-year-old Ryan Larson ambushed the officer, shooting him twice. Larson is in custody." During that program, a reporter stated: "He was the good guy last night going to check on someone who needed help. That someone was 34-year-old Ryan Larson who investigators say opened fire on Officer Tom Decker for no reason anyone can fathom." The story cut to the interview with Decker's mother, who stated: "His mind must have really been messed up to do something like that. I know Tom would have forgave him." KARE 11 ended by describing Larson's background: "He does not have an extensive *489 criminal history, but was cited with disorderly conduct in 2009. He was a second year machine tool student at St. Cloud Tech. Larson is being held in the Stearns County Jail."
KARE 11 also posted an article to its website, either on November 30 or December 1, which stated: "Investigators believe [Larson] fired two shots into Cold Spring police officer Tom Decker, causing his death."
Statements on December 1 by the St. Cloud Times
On December 1, 2012, the St. Cloud Times published a story on the front page with the headline, "Man faces murder charge." The article stated: "Ryan Michael Larson, 34, is in Stearns County Jail and faces possible charges of second-degree murder. Police say Larson is responsible for the shooting death of Cold Spring-Richmond Police Officer Tom Decker."
Larson's Release and Statements on December 5 by the St. Cloud Times
By December 4, 2012, investigators determined that there was insufficient evidence to further detain Larson, and released him. On December 5, 2012, the St. Cloud Times published an article about Larson's release. Referring to a community member, the article stated: "[S]he had one thing she wanted to say to Larson if she got to [sic] the chance to see him leave the jail. 'This isn't over,' she said."
Larson Officially Cleared as a Suspect
After Larson's release, police continued their investigation. By January 2, 2013, Eric Thomes was the lead suspect, but he committed suicide "just hours after agents came to question him." A search of Thomes's property revealed a weapon that investigators determined was the gun that killed Decker. Investigators officially cleared Larson in August 2013.
Procedural History
Larson sued appellants, alleging defamation and identifying 11 statements made either by KARE 11 on November 30 or by the St. Cloud Times on December 1 and 5. The statements may be summarized into three groups. The first group of statements attributed information to what police or investigators said or believed.[2]
1. "Police say that man-identified as 34-year-old Ryan Larson-ambushed Officer Decker and shot him twice, killing him."
2. "Investigators say 34-year-old Ryan Larson ambushed the officer, shooting him twice. Larson is in custody."
3. "[Decker] was the good guy last night, going to check on someone who needed help. That someone was 34-year-old Ryan Larson who investigators say opened fire on Officer Tom Decker for no reason anyone can fathom."
4. "Investigators believe [Larson] fired two shots into Cold Spring police officer Tom Decker, causing his death."
5. "Police say Larson is responsible for the shooting death of Cold Spring-Richmond Police Officer Tom Decker." The second group of statements referred to the accusation against Larson.
6. Decker's mother "holds no ill-will against the man accused of killing her son."
7. "Ryan Larson, the man accused of killing Officer Decker, could be charged as early as Monday."
8. "Man faces murder charge ."
The third group of statements conveyed other information about Larson.
9. Decker's mother stated: "His mind must have really been messed up to do *490 something like that. I know Tom would have forgave him."
10. "[Larson] does not have an extensive criminal history, but was cited with disorderly conduct in 2009. He was a second year machine tool student at St. Cloud Tech. Larson is being held in the Stearns County Jail."
11. Comment by a community member after Larson's release: "[S]he had one thing she wanted to say to Larson if she got to [sic] the chance to see him leave the jail. 'This isn't over,' she said."
Appellants moved for summary judgment in December 2015, arguing that the fair-report privilege barred Larson's defamation claim. On May 19, 2016, the district court granted summary judgment, in part, after determining that appellants' statements reporting information from "the jail log and the [a]pplication to [d]etain and [o]rder are entitled to the [fair-report] privilege." Similarly, the district court reasoned that, "to the extent the news conference and news release only communicated the fact of Mr. Larson's arrest or the charge of crime made by the officer in making or returning his arrest, these sources are entitled to the [fair-report] privilege" but that the privilege did not extend to appellants' statements that went beyond Larson's arrest and anticipated charge. But the district court denied summary judgment because "genuine issues of material fact exist[ed] regarding whether [appellants] abused the privilege."
A jury trial began on November 7, 2016. On November 10, the district court issued a new summary-judgment order on the fair-report privilege, expressly modifying its May 19 summary-judgment order. In the November 10 order, the district court concluded that statements 1-5, involving what police said or believed, were not protected by the fair-report privilege because they were "not substantially accurate as a matter of law" and the statements went beyond "the fact of [Larson's] arrest." The district court reasoned that "the effect" of the news reports was that "police firmly believed" that Larson had killed Decker, "they were likely proceeding with murder charges," and that charges "could be brought as early as Monday." Because appellants' statements "created the impression of finality to the investigation," and law enforcement "repeatedly emphasized" that the investigation was preliminary, the news reports produced a "harsher effect" than "the precise truth would have produced." The district court also determined that statements 6-8, regarding accusations against Larson, were not substantially accurate because they implied that Larson had, in fact, been formally charged by the prosecution, which was not true.
On November 16, the seventh day of the trial, appellants moved for judgment as a matter of law, in part arguing that statements 9-11 were not defamatory as a matter of law. The district court took the motion under advisement and, on the next day of trial, denied other issues raised by the motion, but granted the motion, in part, by dismissing statements 9-11 as "not capable of ... defamatory meaning."
Statements 1-8 went to the jury along with a 25-page special verdict form that included eight separate interrogatories about each statement to determine appellants' liability, in addition to separate questions on damages. On November 21, 2016, the jury returned its verdict, finding that each statement was defamatory, referred to Larson, and was published. But the jury also determined that each statement was not false. The district court directed entry of judgment in appellants' favor on December 5, 2016, and judgment was entered on January 5, 2017.
*491 On January 3, 2017, Larson moved for a judgment as a matter of law or, alternatively, for a new trial. The district court granted in part and denied in part Larson's motion. In an order dated June 13, 2017, the district court vacated the December order and judgment in appellants' favor and scheduled a new trial. The district court first modified its November 10 summary-judgment order by stating that the fair-report privilege "does not apply to" this case. The court reasoned that appellants' statements were not protected because the information relayed by law enforcement at the press conference and in the news release went "beyond the mere fact of arrest or charge." The district court then determined that statements 1-8 were "as a matter of law ... defamatory in nature and false." The district court also concluded that it had erred in dismissing Larson's claims regarding statements 9-11 because a reasonable jury could have found that these statements implied that Larson killed Decker. On these grounds, the district court granted a new trial concerning all 11 statements. The district court denied Larson's request to determine additional issues as a matter of law. This appeal follows.
ISSUES
I. Did the district court err in granting judgment as a matter of law because the fair-report privilege does not apply to news reports about statements made by law enforcement at an official press conference and in an official news release?
II. Did the district court err in granting a new trial?
ANALYSIS
Appellants argue that the district court erred in granting judgment as a matter of law to Larson based on its conclusion that the fair-report privilege did not apply to news reports about law-enforcement statements at the November 30 press conference and in the subsequent news release. In particular, appellants contend that the district court incorrectly determined that statements 1-8 were false as a matter of law. Appellants also argue that the district court incorrectly granted a new trial on all statements, including statements 9-11, which the district court had properly dismissed during trial. Alternatively, appellants urge us to conclude that the district court incorrectly denied their motion for judgment as a matter of law because Larson failed to offer evidence that appellants were negligent or caused his damages.
We first hold that the fair-report privilege applies to fair and accurate reports of statements by law enforcement during an official press conference and in an official news release. We also conclude that the fair-report privilege protected fair and accurate news reports about the November 30 press conference and news release. Then, we determine that there were genuine issues of fact as to whether statements 1-8 were substantially accurate summaries or fair abridgments of law-enforcement statements from the official press conference and news release. Next, we conclude the district court erred in vacating the judgment on the jury's verdict and in ordering a new trial. The district court's jury instructions sufficiently stated the applicable law and any error was harmless. As a result, we do not reach appellants' alternative arguments. We reverse the district court's order entering judgment as a matter of law and for a new trial, and remand with directions to enter judgment in appellants' favor.
I. The fair-report privilege extends to fair and accurate news reports about law-enforcement statements made at an official press conference or in an official news release.
To establish a claim of defamation for a statement made by a defendant, *492 a plaintiff must show that: "(1) the defamatory statement was communicated to someone other than the plaintiff; (2) the statement is false; (3) the statement tends to harm the plaintiff's reputation and to lower [him] in the estimation of the community; and (4) the recipient of the false statement reasonably understands it to refer to a specific individual." McKee v. Laurion , 825 N.W.2d 725, 729-30 (Minn. 2013) (quotations omitted). Even if a plaintiff satisfies each of these elements, a defendant is not liable if an absolute or qualified privilege protects the defamatory statement. See Moreno v. Crookston Times Printing Co. , 610 N.W.2d 321, 329 (Minn. 2000). But a defendant may lose an otherwise applicable qualified privilege by abusing it. Id. at 329, 333. This court reviews the application of defamation privileges de novo. See Minke v. City of Minneapolis , 845 N.W.2d 179, 182 (Minn. 2014).
A. The district court erred in concluding that the fair-report privilege did not apply to this case.
Minnesota has recognized the fair-report privilege for over a century, but questions remain about its scope. In Nixon v. Dispatch Printing Co. , the Minnesota Supreme Court held that the fair-report privilege extends to protect reports of judicial proceedings, but does not apply to reports of legal pleadings filed with a district court. 101 Minn. 309, 311-13, 112 N.W. 258, 258-59 (1907). Most recently, the supreme court ruled that the privilege applies to an "accurate and complete report or a fair abridgement of events that are part of the regular business of a city council meeting." Moreno , 610 N.W.2d at 333. Whether the privilege applies to reports about information relayed by law enforcement at press conferences and in news releases is an issue of first impression in Minnesota.[3]
Moreno guides our understanding of the scope of the fair-report privilege. In that case, during public comment at a city council meeting, a citizen stated that a local police officer was "dealing drugs out of his Police car." Id. at 323. A newspaper reported the citizen's accusation, summarized the police department's response, and relayed some details from the newspaper's own investigation. Id. at 324. The police officer sued the newspaper for defamation. Id. at 325. The supreme court held that the fair-report privilege applied to a news report of events at a city council meeting, including the citizen's accusation. Id. at 332-33. In doing so, the supreme court predicated much of its analysis on section 611 of the Restatement (Second) of Torts (1976). Id. at 331. That section states:
The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.
Restatement (Second) of Torts § 611.
The supreme court explained that the fair-report privilege is based on two principles. "First, because the meeting was public, a fair and accurate report would simply relay information to the reader that she would have seen or heard herself were she present at the meeting. The second principle *493 is the obvious public interest in having public affairs made known to all." Moreno , 610 N.W.2d at 331 (citations and quotation omitted). The supreme court concluded the fair-report privilege extended to legislative proceedings because the same "policy considerations" that supported applying the privilege to judicial proceedings in Nixon also supported its application to legislative proceedings. Id. at 332. The court also noted that the legislature "in the criminal context, [recognized] the policy objectives of a fair and accurate reporting privilege are furthered by protecting such reports from challenges of common law malice." Id. at 333 (citing Minn. Stat. Ann. § 609.765, advisory comm. cmt. (West 1964) ).[4]
After holding that the fair-report privilege extended to city council meetings, the supreme court also held that the privilege may be abused if the report is not fair and accurate or if the report includes "additional contextual material, not part of the proceeding" and that material "either conveyed a defamatory impression or commented on the veracity or integrity of any party." Id. at 333-34. Because the news article at issue in Moreno reported on events outside the city council meeting, the supreme court remanded for factual determinations regarding the additional material in the news article. Id. at 334.
Based on Moreno , we conclude that the fair-report privilege applies to protect news reports that accurately and fairly summarize statements made by law enforcement during an official press conference and in an official news release for three reasons. First, a law-enforcement press conference is a "meeting open to the public that deal[s] with matters of public concern." See Restatement (Second) of Torts § 611. Likewise, a law-enforcement news release is a "report of an official action or proceeding." See id. Moreno 's analysis of the city council meeting is applicable to the November 30 press conference and news release. The press conference and news release were public, therefore, "a fair and accurate report would simply relay information to the reader that she would have seen or heard herself were she present at the meeting." See Moreno , 610 N.W.2d at 331. And, there was an "obvious public interest" in relaying to the public the information provided by law enforcement. In fact, public interest in police statements about the slaying of a police officer is perhaps more obvious than public interest in a private citizen's statements during public comment at a city council meeting. While the citizen was commenting on possible criminal activity by a police officer, the citizen had no official capacity. Id . at 332. In contrast, the press conference and news release in Larson's case were official statements by law-enforcement authorities on a recent murder, when public concern over apprehension of the killer was high.
Second, comments to Restatement (Second) of Torts § 611 support the view that the fair-report privilege applies to official written statements by law enforcement. For example, comment (i) states the privilege "also extends to a report of any meeting, assembly or gathering that is *494 open to the general public and is held for the purpose of discussing or otherwise dealing with matters of public concern." Restatement (Second) of Torts § 611 cmt. i. Comment (d) extends the privilege to "the report of any official proceeding, or any action taken by any officer or agency of the government of ... any State or any of its subdivisions." Restatement (Second) of Torts § 611 cmt. d. Comment (d) continues, "Since the holding of an official hearing or meeting is itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no action is taken." Id. These comments suggest the privilege extends to law-enforcement press conferences and news releases because both types of statements disseminate official information to the public.
Third, the criminal defamation statute that Moreno analyzed also suggests that the fair-report privilege extends to this context. While the statute explicitly provides that criminal defamation is justified when the communication is a "fair and true report or a fair summary" of judicial and legislative proceedings, it also extends a privilege to "other public or official proceedings." Minn. Stat. § 609.765, subd. 3(4). The November 30 press conference is in the nature of an official proceeding because law enforcement from the state, county, and municipality jointly convened the conference to inform the public about an ongoing investigation.
The district court rejected application of the fair-report privilege based on three arguments: (1) the fair-report privilege does not apply to official statements that comment on more than the fact of an arrest or charge; (2) the fair-report privilege does not apply to "extra-judicial statements; and (3) statements beyond the fact of arrest threaten the impartiality of the jury pool. We address each argument in turn.
First, the district court concluded that the fair-report privilege did not apply to reports about law-enforcement statements at press conferences "that go beyond the mere fact of arrest and the charge of arrest" and that precede commencement of judicial proceedings. In doing so, the district court relied on comment (h) of section 611 of the Restatement (Second) of Torts, which the supreme court referenced approvingly in Moreno . 610 N.W.2d at 332. Comment (h) states:
An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section . On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section.
Restatement (Second) of Torts § 611 cmt. h (emphasis added). The district court reasoned that "Minnesota courts have consistently analyzed extra-judicial statements like the ones at issue in this case under Comment h and not under any other section of the Restatement." The district court also stated that construing "these statements under a different provision of the Restatement would strip Comment h of any meaning."
The district court erred in its analysis of comment (h). The district court's statement that Minnesota courts have analyzed "statements like the ones at issue in this case under Comment h and not under any other section of the Restatement" is unfounded. Neither the district court nor *495 Larson point to any cases, much less Minnesota cases, applying comment (h) to official statements by law enforcement.[5]
Comment (h) should be understood to mean that the privilege does not apply to unofficial police comments that are not a part of an official meeting or statement by law enforcement. Moreno cited comment (h) to support its conclusion that "[a] reporter also may not make additional comments, not part of the meeting , that would convey a defamatory impression or impute corrupt motives to any one, [or] ... indict expressly or by innuendo the veracity or integrity of any of the parties." 610 N.W.2d at 332 (emphasis added) (quotation omitted); see also Carradine v. State , 511 N.W.2d 733, 737 (Minn. 1994) (holding police officer comments to press that departed from official report and added to plaintiff's injury were not privileged).
Additionally, the district court's conclusion that comment (h) means the privilege is limited to the fact of arrest or criminal charge is not consistent with Moreno , which applied the privilege to a news report of a citizen's statements about criminal activity by a police officer, even though the officer had not been arrested or charged with any wrongdoing. 610 N.W.2d at 324. The news report about the citizen's statements was privileged because it summarized public comments at a city council meeting. Id. at 333. The logical extension of the district court's ruling, if we attempt to construe it along with Moreno , suggests that the privilege would have applied had appellants reported on law-enforcement statements during a city council meeting. We can discern no meaningful distinction between citizen statements about criminal activity that are made at a city council meeting and police statements about a recent crime at an official press conference.
Second, the district court characterized the press conference and news release as "extra-judicial" statements, and determined that the fair-report privilege did not apply to them as a result. It is correct that several Minnesota cases, state and federal, have analyzed whether the statements summarized in news reports originated in judicial proceedings. See, e.g. , Schuster , 602 F.2d at 851-55 ; Hurley , 273 F.Supp. at 969-72 ; Nixon , 101 Minn. at 311-13, 112 N.W. at 258-59. But no state or federal Minnesota case has held the fair-report privilege applies only to news reports that summarize statements in judicial proceedings and in no other official proceedings. In fact, Moreno confirmed that the privilege is not limited to judicial proceedings, by holding that the privilege applies to news reports about legislative proceedings and city-council meetings. 610 N.W.2d at 332-33.
Third, the district court pointed out that the Minnesota Rules of Professional Conduct prohibit prosecutors from making "extra-judicial statements" that will have a "substantial likelihood of materially prejudicing a jury trial in a pending criminal matter." See Minn. R. Prof. Conduct 3.6. We acknowledge the importance of ensuring that media coverage of crimes does not taint the jury pool. See Neb. Press Ass'n v. Stuart , 427 U.S. 539, 568-69, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683 (1976) (recognizing tension between preserving an unbiased *496 jury pool and protecting freedom of the press). We trust that law enforcement also has this concern in mind and accordingly tempers its official statements.
The ethical rule cited by the district court does not persuade us that the fair-report privilege is inapplicable to news reports of official statements at press conferences and in news releases. As Moreno stated, "the public interest is served by the fair and accurate dissemination of information concerning the events of public proceedings." 610 N.W.2d at 332. Additionally, voir dire serves to protect a defendant's right to an unbiased jury. See Stuart , 427 U.S. at 563-64, 96 S.Ct. at 2805 (recognizing voir dire as a method to preserve the defendant's right to a fair trial, despite intense press coverage). We conclude that the public interest is served by fair and accurate reports about information conveyed by law enforcement at an official press conferences or in an official news release. While this conclusion leads us to extend the fair-report privilege to news reports of official law-enforcement statements, we also note that this privilege is qualified and does not protect news reports that fail to fairly and accurately reflect official statements.
Accordingly, the fair-report privilege applied to fair and accurate news reports of law-enforcement statements made at the November 30 official press conference and in the official news release. Thus, the district court erred when it determined, in its posttrial order granting Larson judgment as a matter of law, that the fair-report privilege "does not apply to this case."
B. Whether appellants abused the fair-report privilege in the news reports identified by Larson raised a genuine issue of material fact for the jury.
Even if the fair-report privilege is applicable, the privilege can be abused or "defeated" upon a showing that the report was not fair and accurate, or that the report included additional material that was outside the official proceeding and the additional material conveyed a defamatory meaning. Moreno , 610 N.W.2d at 334. In denying summary judgment, the district court determined that the evidence presented a question of fact whether the news reports were fair and accurate. In granting a new trial to Larson and in vacating the jury's verdict, the district court reversed itself, in part, and determined that statements 1-8 were false as a matter of law.
Moreno expounded on "what additions will generally defeat the fairness and accuracy of a report." Id . at 333. Moreno referenced approvingly comment (f). Id. at 333. Although not explicitly discussed in Moreno , comment (f) states that that the report does not need to be "exact in every immaterial detail or ... conform to that precision demanded in technical or scientific reporting." Restatement (Second) of Torts § 611 cmt. f. Comment (f) continues, "It is enough that [the report] conveys to the persons who read it a substantially correct account of the proceedings." Id. Whether a defendant has abused a privilege is "generally a question for the jury." Stuempges v. Parke, Davis & Co. , 297 N.W.2d 252, 257 (Minn. 1980).
Appellants argue that their reporting of the press conference and news release was substantially accurate as a matter of law and the district court erred in submitting this case to the jury. Larson argues that appellants abused any privilege because their reports inaccurately communicated that police had conclusively identified Larson as the killer. Larson's argument in this regard is confusing. At times, he appears to suggest that appellants' reports were not substantially accurate *497 because Larson did not shoot Decker. But the appropriate standard is whether appellants' reports accurately summarized or fairly abridged statements made by law enforcement at the press conference or in the news release. See Moreno , 610 N.W.2d at 334.
We conclude that there was a genuine issue of fact whether appellants' reports, i.e., statements 1-8, were substantially accurate summaries or fair abridgements of law-enforcement statements at the press conference and in the news release. Appellants' reports used terminology and recited some facts not mentioned at the press conference or in the news release. Most of these differences appear to be minor details, such as stating that Decker was shot twice. But some differences may be more significant. At the press conference, law enforcement did not "say" that Larson ambushed Decker, but law enforcement did "say" that Decker was shot and ambushed and that they had arrested Larson in connection with the shooting. Further, the news release and jail log indicated that Larson was being held and a murder charge was anticipated. Thus, if law-enforcement statements from the jail log, press conference, and news release are considered together, a reasonable jury may conclude that statements 1-8 were substantially accurate reports of official statements.
In Utecht v. Shopko Dep't Store , the supreme court clarified when a judge should defer to a jury verdict in a defamation case. 324 N.W.2d 652, 653-54 (Minn. 1982). The court stated it had "often cautioned that summary judgment is not a substitute for trial" and urged judges to allow the jury to decide whether words "capable of the defamatory meaning" were understood to be defamatory. Id . A similar analysis applies to whether a news report is a fair and accurate summary. As a result, we conclude that a genuine issue of material fact existed as to whether statements 1-8 accurately reported or fairly abridged law-enforcement statements from the November 30 press conference and news release.
Consistent with this ruling, the district court correctly denied summary judgment to appellants before trial and erred in granting partial judgment to Larson after trial by determining that statements 1-8 were false as a matter of law.
II. The district court erred in granting a new trial.
Generally, "the decision to grant a new trial does lie within the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion." Halla Nursery, Inc. v. Baumann-Furrie & Co. , 454 N.W.2d 905, 910 (Minn. 1990). But if "the new trial was based on an error of law, not an exercise of discretion," the appellate court reviews the decision de novo. Id. While decisions granting a new trial are not generally appealable, the order granting a new trial here was appealable because the district court determined that the new trial was warranted based on errors of law. See Minn. R. Civ. App. P. 103.03(d) ; O'Brien v. Wendt , 295 N.W.2d 367, 370 (Minn. 1980). In order to grant a new trial, the error must have been prejudicial. Torchwood Props., LLC v. McKinnon , 784 N.W.2d 416, 419 (Minn. App. 2010).
The district court granted a new trial to Larson for three related reasons. First, the district court determined it erred when it denied requested jury instructions. Before the case was submitted to the jury, Larson asked the court to instruct the jury on falsity by implication, but the district *498 court denied the request.[6] After trial, Larson asked for a new trial on this ground and the district court concluded it had erred because, according to the district court, each of the statements implied that Larson killed Decker.
Second, the district court rejected appellants' argument that the fair-report privilege affected its analysis of falsity, reiterating that "statements made by law enforcement at a press conference that go beyond the mere fact of arrest or charge are not protected before judicial proceedings commence." Additionally, the district court concluded that statements 1-8, regarding what police said or the accusations against Larson, were false as matter of law because "[t]here is no evidence that Mr. Larson killed Officer Decker." Thus, a new trial was required to address negligence and damages on those statements. Third, the district court decided that a new trial was necessary to correct its error in dismissing statements 9-11 because those statements also implied that Larson killed Decker and thus raised a question of fact for the jury.[7]
We conclude that the district court erred in granting a new trial for three reasons. First, the fair-report privilege applies to this case and the district court erred in failing to use the privilege as the starting point from which to analyze the falsity instruction.[8] The falsity instruction given in this case closely followed the pattern instruction.
A statement or communication is false if it is not substantially accurate. Substantial accuracy does not require every word to be true. A statement or communication is substantially accurate if its substance or gist is true. In determining whether a statement was false, the words must be construed as a whole without taking any word or phrase out of context. The meaning of the statement *499 must be construed in the context of the article and broadcast as a whole.
See 4 Minnesota Practice , CIVJIG 50.25 (2014). The district court declined Larson's request to add the following: "A statement or communication is false if the implication of the statement is false." See 4 Minnesota Practice , CIVJIG 50.25 (2014). This court will not overturn a jury verdict if the instructions "overall fairly and correctly state the applicable law." Hilligoss v. Cargill, Inc. , 649 N.W.2d 142, 147 (Minn. 2002). Even if a district court's instructions do not fairly and accurately describe the applicable law, we will reverse the jury's verdict only "if the error destroy[ed] the substantial correctness of the charge as a whole, cause[d] a miscarriage of justice, or result[ed] in substantial prejudice." Domagala v. Rolland , 805 N.W.2d 14, 31 (Minn. 2011).
Here, the district court's falsity instruction did not destroy the "substantial correctness of the charge as a whole," see id. , because the instruction directed the jury to determine substantial accuracy, to construe words as a whole, and to assess the meaning of each statement in context. Caselaw suggests that, when the fair-report privilege applies to a defamation claim, the falsity instruction should focus the jury's attention on the substantial accuracy of the news report and not the content of what is being reported. See generally Moreno , 610 N.W.2d at 331 ("[O]nce it is established that the report is within the scope of the fair and accurate reporting privilege, fault is not determined by the truth or falsity of the content of the defamatory statement. It is determined by the accuracy with which the statement is reported."). We note that the special verdict form quoted statements 1-8 verbatim so the jury was directed to focus its attention on the substantial accuracy of the news report.
Second, the district court erred in its conclusion that statements 1-8 required an instruction on falsity by implication, which is when true statements "because of the particular juxtaposition of the statements or the omission of particular facts" become false. Schlieman v. Gannett Minn. Broad., Inc ., 637 N.W.2d 297, 303 (Minn. App. 2001), review denied (Minn. Mar. 19, 2002). In Diesen v. Hessburg , the Minnesota Supreme Court held, by a plurality, that an allegedly false implication that arises out of true statements is generally not actionable in defamation by a public-official plaintiff against a news media. 455 N.W.2d 446, 451-52 (Minn. 1990).[9] In a subsequent decision by this court, we observed that Diesen 's holding "is consistent with First Amendment principles that guarantee a free press." Schlieman , 637 N.W.2d at 303. The same First Amendment principles may support the conclusion that falsity by implication is not actionable in a defamation action by a private plaintiff where the fair-report privilege protects media reports. However, we need not decide this weightier constitutional issue because we determine that the district court erred in its legal conclusion that statements 1-8 implied Larson shot Decker.
As the district court aptly stated before it charged the jury, statements 1-8 are factually true or false because they are reports about what police said or believed and what accusations Larson faced. Because the statements contain caveats such as "police say," the district court erred in concluding, posttrial, that these statements *500 implied Larson actually killed Decker. Also, the district court sufficiently instructed the jury on substantial accuracy, including directions to consider the statements in context; therefore, we conclude that the district court erred when it determined that falsity by implication applied to statements 1-8.
Third, even if we assume that the district court erred in dismissing statements 9-11, this error was harmless. Appellants urge us to reach this conclusion under the incremental-harm doctrine, which provides that "if a jury properly might find that the additional [defamatory] statements significantly added to any injury sustained by plaintiff over and above any injury sustained as a result of [absolutely privileged statements], then plaintiff should be allowed to proceed to trial ...; otherwise, not." Carradine , 511 N.W.2d at 737. The supreme court has applied this doctrine to defamation cases against public officials that are protected by absolute privilege. See id. And the supreme court stated that the fair-report privilege falls somewhere in between an absolute and qualified privilege. Moreno , 610 N.W.2d at 331.
Significant parallels between absolute privilege and the fair-report privilege suggest that the incremental harm doctrine should apply here. See id. at 328, 331 (explaining that absolute privilege protects "a publisher of potentially defamatory statements regardless of motive and cannot be defeated by any showing of malice" while the fair-report privilege is "somewhat broader in its scope" than other conditional privileges because common-law malice does not affect its application). In both situations-statements by public officials and news reports summarizing official statements-the public has a significant interest in hearing the protected statements. See id. ("An absolute privilege applies to protect the public service or the administration of justice" while fair-report privilege exists in part based on "the obvious public interest in having public affairs made known to all." (quotation omitted) ).
Larson offered no evidence that he suffered any additional harm through statements 9-11 that he did not also sustain through statements 1-8, which were protected by the fair-report privilege and found to be substantially accurate by the jury. Accordingly, applying the incremental harm doctrine, we conclude that Larson suffered no prejudice as a result of the district court's decision to dismiss statements 9-11, and, consequently, the district court erred in granting a new trial.
DECISION
The district court erred in concluding that the fair-report privilege did not apply to this case, erred in setting aside the jury's verdict, and erred in vacating the judgment with regard to statements 1-8. Additionally, the district court erred by ordering a new trial and including statements 9-11. As a result, we reverse the district's order granting a new trial and remand with instructions to enter judgment in favor of appellants. Based on our decision, there is no reason to address appellants' other arguments.
Reversed and remanded.

Respondent's claims against two other defendants, Gannett Satellite Networks Inc., and Gannett Company Inc. were dismissed.

We have numbered the statements and bolded the relevant words for easy reference.

We agree with the district court that the fair-report privilege applies to news reports that summarize information in a jail log or in a court order authorizing detention. Because appellants' news reports contained information not included in the jail log and detention order, we must determine if the fair-report privilege protects appellants' statements summarizing the press conference and the news release.

The advisory committee note to Minn. Stat. § 609.765, subd. 3(4), states that "[u]nder the recommended section, if the report is fair and true, malice is immaterial and no criminal liability arises. The public interest in publication of the proceedings referred to would seem to call for this position." Minn. Stat. Ann. § 609.765, advisory comm. cmt. (West 1964). Further, we note that in Moreno , the supreme court appears to have mistakenly cited to Minn. Stat. § 609.675 (2016) (exposure of unused refrigerator or container to children) instead of Minn. Stat. § 609.765 (2016) (criminal defamation). 610 N.W.2d at 333.

The district court seemed to rely on two federal cases applying the fair-report privilege under Minnesota law after Nixon but before Moreno . See Schuster v. U.S. News & World Report, Inc. , 602 F.2d 850, 851-55 (8th Cir. 1979) (holding privilege applied to grand jury indictment); Hurley v. Nw. Publ'ns, Inc. , 273 F.Supp. 967, 971 (D. Minn. 1967) (holding privilege applied to complaint filed "pursuant to the prior order of [a] Probate Court arising out of probate proceedings pending therein"). Neither of these cases, however, mentions or cites comment (h).

Larson also asked the court to instruct the jury on defamation by implication, by adding to the definition of a defamatory statement language similar to the pattern instruction:
A statement or communication may be defamatory because the defendant:
1. Left out certain facts so the statement conveyed a defamatory meaning.
2. Linked statements in a way that conveyed a defamatory meaning.
3. Stated an opinion that conveyed defamatory facts.
See 4 Minnesota Practice , CIVJIG 50.10 (2014). The district court declined. Larson's new-trial motion sought a new trial on this ground and the district court concluded that it erred in failing to give this additional language as part of the definition of defamation. Because the jury found each of the eight statements to be defamatory, we conclude that any error in the instruction on defamation was not prejudicial to Larson and cannot support an order for new trial. McKinnon , 784 N.W.2d at 419.

The district court also set aside the jury's verdict on the ground that the jury was not instructed on defamation by republication. See Restatement (Second) of Torts § 578 ("[O]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.") Because Larson did not ask during trial for an instruction on defamation by republication, he forfeited this issue as a basis for the new-trial order unless he showed plain error affecting substantial rights. See Minn. R. Civ. P. 51.04(a)-(b). Larson's brief on appeal does not argue plain error, thus, we do not consider this issue.

Notably, appellants do not challenge the falsity instruction because they seek reinstatement of the jury verdict. Because appellants do not raise the issue, we do not determine whether the falsity instruction correctly stated the applicable law for the fair-report privilege. See Wolner v. Mahaska Indus. , 325 N.W.2d 39, 42 (Minn. 1982) ("Where a party makes no objections to jury instructions before the jury retires, and does not specify fundamental errors in a motion for a new trial, the instructions are the law of the case and may not be challenged for the first time on appeal.").

To be clear, the district court considered Diesen and reasoned that its prohibition against defamation by implication did not apply because Larson is a private individual and "did not voluntarily thrust himself into the public sphere like a public official."